COMMONWEALTH vs. RANDALL SPEARIN
(and eight companion cases[1]).

Bristol. March 6, 2006. - April 27, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Destruction of Property. County,* Correctional facilities. *Riot. Evidence,* Joint
venturer, Intent, Prior misconduct. *Practice, Criminal,* Instructions to jury.

This court concluded that the criminal defendants' convictions of building
destruction while unlawfully assembled could not stand, because the ap-
plicable statutes, G. L. c. 269, §§ 1 and 7, did not apply to inmate riots oc-
curring at a county house of correction; consequently, this court reversed
those convictions, as well as the defendants' convictions under G. L.
c. 269, §§ 1 and 2, of refusing to disperse from an unlawful assembly.
[603-607]
At the trial of indictments charging the defendant, inter alia, with hostage tak-
ing, in violation of G. L. c. 127, § 38A, the judge did not abuse his discre-
tion in excluding evidence of a fight between the defendant and a third
party that occurred two and one-half months prior to the events at issue
(which evidence, the defendant argued, was relevant to show animosity
between him and the third party, thus undercutting his ability to participate
in a joint venture with the third party), where the defendant made no offer
of proof concerning the substance and details of the fight apart from the
fact of the fight itself, and offered no evidence of any continued animosity
between him and the third party after the fight. [607]
At the trial of indictments charging the defendant, inter alia, with hostage tak-
ing, in violation of G. L. c. 127, § 38A, the judge's instructions to the jury
did not fail to designate the defendant as the person the jury must find to
have seized or detained the hostage, nor did they fail to designate the
person seized; moreover, the judge's slip of the tongue in his instructions
did not create a substantial risk of a miscarriage of justice. [607-609]
Statement of the language that a judge's instruction to the jury should include
in a prosecution under G. L. c. 127, § 38A. [609]

INDICTMENTS found and returned in the Superior Court Depart-
ment on May 10, 2001.

The cases were tried before *Richard F. Connon,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

---

[1]Two against Randall Spearin and six against Gualter M. Camara.

*Alan D. Campbell* for Gualter M. Camara.

*Joseph J. Mazza* for Randall Spearin.

*David B. Mark,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. Based on the defendants' conduct in an inmate uprising at the Bristol County house of correction on April 15, 2001, a jury in the Superior Court, after a joint trial, convicted the defendant Randall Spearin, as a joint venturer, of building destruction while unlawfully assembled, G. L. c. 269, § 7,[2] and the defendant Gualter M. Camara, as a joint venturer, of hostage taking, G. L. c. 127, § 38A.[3] (Several other inmates were also tried along with the defendants.) Represented by separate counsel, the defendants raise different arguments on appeal. Spearin argues that the statute under which he was convicted, G. L. c. 269, § 7 (building destruction while unlawfully assembled), does not apply to county house of correction disruptions. Camara argues error in the exclusion of evidence at trial, and in the judge's instructions to the jury on hostage taking. We transferred the case here on our own motion. We conclude that the defendants' convictions of refusing to disperse from an unlawful assembly and building destruction while unlawfully assembled cannot stand. Based on the Commonwealth's concession, we also reverse Camara's convictions on two assault charges. See note 3, *supra.* We affirm Camara's conviction of hostage taking.

The jury could have found the following facts. On April 15,

---

[2]Spearin was also convicted of refusing to disperse from an unlawful assembly, G. L. c. 269, §§ 1 and 2, and of causing injury to a penal institution, G. L. c. 266, § 130. Those two convictions were placed on file with his consent. The jury acquitted Spearin of charges of assault on a correctional officer and assault by means of a dangerous weapon. Subsequently, Spearin pleaded guilty to being a habitual offender on the indictment charging building destruction while unlawfully assembled.

[3]Camara was also convicted of refusing to disperse from an unlawful assembly, G. L. c. 269, §§ 1 and 2; building destruction while unlawfully assembled, G. L. c. 269, § 7; causing injury to a penal institution, G. L. c. 266, § 130; assault on a correctional officer, G. L. c. 127, § 38B; and assault by means of a dangerous weapon, G. L. c. 265, § 15B. The first three of these convictions were placed on file with Camara's consent. The Commonwealth concedes that the judgments of convictions on the latter two assault charges must be reversed and the jury verdicts set aside, because the evidence was insufficient to sustain them on the theory submitted to the jury.

2001 (Easter Sunday), the defendants were incarcerated at the Bristol County house of correction (institution). That afternoon, Spearin was released out of his unit, along with twelve other inmates, to attend services at the institution's chapel. Three of the inmates, including Spearin, stopped at the basketball courts in the courtyard where a large number of inmates had gathered. The group consisted of approximately 150 inmates and included Camara. The inmates were agitated and disgruntled over certain policies that had been implemented. One correction officer ordered the group to "lock into" their units or to "lock down."[4] The inmates did not obey.

Many of the inmates, including Spearin, were yelling, and some, including Camara, had undressed. A correction officer said to Spearin, "While your gripes may be legitimate, you're going about it the wrong way on the wrong day . . . . There's no administration here to address your concerns." Spearin replied, "Well, fuck it. We'll get them to come in then." Spearin also insisted, "No one's locking in. No one's going anywhere." Spearin refused to lock down and urged other inmates to stay where they were. While a few inmates returned to their cells, most of the inmates remained in the yard and refused to comply with the lock down order. When two correction officers took hold of an inmate to escort him back to his cell, Spearin yelled that they should not touch any inmate, and that no one was locking in. Richard McMullen, another inmate, said, "We have to take this now before they [the correction officers] get bigger."

A few minutes later, some of the inmates started throwing rocks, and approximately fifty inmates charged the correction officers who had joined forces in the yard. The officers retreated to the rotunda doors. Inmates were yelling and throwing things (including rocks) as the officers withdrew. McMullen yelled, "Let's get them before they regroup." One of the nearby correction officers was knocked down after being struck in the chest with a large rock. He was dragged into the rotunda by other officers.

In the meantime, some of the inmates remained in the yard and others went into the print shop, climbed up onto the roof,

---

[4]To "lock down" required an inmate to walk back to his unit.

and entered the HA and HB units.[5] The inmates who entered the HA unit did so by smashing its windows. Once inside, they repeatedly beat the sole correction officer who was there. The correction officer, who was covered in blood, eventually climbed out one of the windows. A group of correction officers went out into the courtyard to rescue that officer and returned with him to the rotunda. Inmates threw rocks at the officers, and one inmate started smashing windows surrounding the rotunda area.

State police and other officers responded. To regain control of the main courtyard, they deployed a range of nonlethal weapons, including gas canisters, stinger grenades, and foam baton rounds. Inmates in the courtyard ran for cover into various buildings, including the HB unit where only one correction officer remained, Officer David Florent.

As the inmates entered the HB unit, Officer Florent barricaded himself in one of the bathrooms. McMullen led the effort to remove Officer Florent from the bathroom. McMullen, together with other inmates, first tried to knock the door down, and then discharged a fire extinguisher under the door. McMullen indicated that he was going to use Officer Florent as a bargaining chip.

McMullen finally gained access to the bathroom by smashing its door open, seriously injuring Officer Florent's back in the process. McMullen grabbed Officer Florent and dragged him to the control desk. McMullen then took him to a handicapped cell where he (McMullen) proceeded to negotiate with officers. Thereafter, McMullen took Officer Florent to an upstairs cell where other inmates kept watch on him.

Once the courtyard was under control, approximately fifty officers approached the HB unit. Because McMullen had used Officer Florent's radio, the approaching correction officers knew the inmates had taken Officer Florent from the bathroom. As the officers lined up outside the windows of the unit, many of the inmates threw debris through the smashed windows. Camara approached a window with a lightning rod taken from the roof and said to the officers, "If you guys try and come in here, we'll fucking kill [Officer Florent] with this, and then we'll kill

[5]The HA unit housed inmates serving sentences, while the HB unit housed inmates awaiting trial.

you." At one point, McMullen came to the window with Officer Florent and held a screwdriver to his throat. McMullen then took Officer Florent back into the unit. One of the correction officers asked if there was a leader with whom he could speak. He addressed McMullen and Camara, each of whom had been pacing back and forth near one of the windows. Spearin was standing further back from the window, behind a control panel. Spearin refused to come to the window to speak.

Another correction officer approached the HB unit to talk with the inmates. He repeatedly asked McMullen where Officer Florent was. McMullen responded that the inmates wanted out of the unit and that the officer captured was injured. McMullen also demanded that the sheriff and a television crew be brought in. The correction officer asked Camara if he was coming out and Camara shook his head no.

A correction officer asked McMullen and Camara to guarantee the safety of Officer Florent. One of two men stated that, when all the inmates were out, the police could have Officer Florent. Some of the inmates then began surrendering. Eventually, Camara and McMullen surrendered. After McMullen surrendered, the correction officers retrieved Officer Florent from a cell on the second floor of the unit.

The inmates' insurrection caused extensive damage to the institution. Five days after the event, Camara told an investigator that he had used a rock to smash several windows in the vocational area in the courtyard because he was unhappy with the way he was being treated at the institution.

1. We conclude that Spearin could not be convicted, as a joint venturer, of building destruction while unlawfully assembled because the applicable statutes, G. L. c. 269, §§ 1 and 7, do not apply to inmate riots occurring at *county* incarceration facilities, such as the house of correction in this case.

In construing statutes, "[t]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be

effectuated." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). "[W]here two or more statutes relate to the same subject matter, they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975). Criminal statutes, of course, are to be strictly construed. *Commonwealth* v. *Perry*, 391 Mass. 808, 813 (1984).

Under G. L. c. 269, §§ 1 and 7, persons engaged in an unlawful, riotous, or tumultuous assembly, who destroy or damage property, are subject to criminal penalties and tort liability. Specifically, G. L. c. 269, § 1, provides:

> "If five or more persons, being armed with clubs or other dangerous weapons, or if ten or more persons, whether armed or not, are unlawfully, riotously or tumultuously assembled *in a city or town*, the mayor and each of the aldermen of such city, each of the selectmen of such town, every justice of the peace living in any such city or town, any member of the city, town, or [S]tate police and the sheriff of the county and his deputies shall go among the persons so assembled, or as near to them as may be with safety, and in the name of the commonwealth command all persons so assembled immediately and peaceably to disperse; and if they do not thereupon immediately and peaceably disperse, each of said magistrates and officers shall command the assistance of all persons there present in suppressing such riot or unlawful assembly and arresting such persons." (Emphasis added.)

In turn, G. L. c. 269, § 7, provides, in pertinent part:

> "If any of the persons so unlawfully assembled demolishes, pulls down or destroys, or begins to demolish, pull down or destroy, a dwelling house or other building . . . he shall be punished by imprisonment in the [S]tate prison for not more than five years or by a fine . . . and shall also be liable in tort to any persons for all damages sustained by him thereby."

The question is whether Spearin, and other inmates, were unlawfully assembled "in a city or town" under § 1. The Commonwealth points out that the house of correction is located in a

town (town of Dartmouth), but that fact obviously is not decisive.

Sections 1 and 7 must be read in conjunction with §§ 2, 3, 4, 5, 6, and 8 of the same statute. When the various provisions are read together, it becomes clear that the statute does not apply to riots occurring at a county house of correction. Significant in the statutory scheme is the mandatory obligation of certain officials to take steps to suppress an unlawful assembly, and the punishment imposed for a failure to do so. For instance, § 1 requires certain officers to order persons unlawfully assembled to disperse, and specifically vests this obligation on "the mayor and each of the aldermen of such city, each of the selectmen of such town, every justice of the peace living in any such city or town, any member of the city, town, or [S]tate police and the sheriff of the county and his deputies." Under § 3, "[a] mayor, alderman, selectman, justice of the peace, sheriff or deputy sheriff who . . . neglects or refuses immediately to proceed to the place of such assembly . . . shall be punished." Under § 4, any two of the aforesaid officers "may require aid of a sufficient number of persons, in arms or otherwise as may be necessary, and shall proceed . . . to disperse and suppress such assembly, and seize and secure the persons composing the same." The Commonwealth overlooks the fact that the majority of officials designated in G. L. c. 269, §§ 1-8, have no authority to maintain security and order in houses of correction. See and compare G. L. c. 124, § 1 (b) (granting commissioner of correction authority to "maintain security, safety and order at all [S]tate correctional facilities . . . [and] take all necessary precautions to prevent the occurrence or spread of any disorder, riot or insurrection"). See also and compare G. L. c. 127, § 33 (jurisdiction of department of correction extends to jails and houses of correction); G. L. c. 126, § 8A (chief administrative officer of house of correction is superintendent). Conversely, the superintendents of houses of correction have no authority to command officers, other than "the officers of the institution." See G. L. c. 127, § 33 (authorizing "superintendents and keepers of jails and houses of correction" to maintain order and "for that purpose they may at all times require the aid and utmost exertions of all the officers of the institution except the chaplain

and the physician"). Municipal officials have no direct author-
ity to suppress inmate riots at a house of correction and to
subject the inmates to punishment. We conclude that G. L.
c. 269, §§ 1-8, by reason of text and purpose, cannot be applied
to riots occurring in a county house of correction.[6] See *Commis-
sioner of Revenue* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999).

We turn to one final matter. Spearin's conviction under G. L.
c. 269, §§ 1 and 2, of refusing to disperse from an unlawful as-
sembly, was placed on file. Camara's convictions under the
same statutory provisions, and under G. L. c. 269, § 7, building
destruction while unlawfully assembled, were placed on file.
We do not usually consider the grant of relief for convictions
placed on file, *Commonwealth* v. *Chappee*, 397 Mass. 508, 523
(1986), but we may do so, in our discretion, in a suitable case.
*Id.* See *Commonwealth* v. *Calderon*, 431 Mass. 21, 28 (2000).
We have concluded that G. L. c. 269, §§ 1-8, cannot reasonably
be applied to riots occurring in a county house of correction. It
follows that Spearin's and Camara's convictions under the
statute of refusing to disperse from an unlawful assembly can-
not stand because their conduct was not criminal. See *Com-
monwealth* v. *Andler*, 247 Mass. 580, 582 (1924). Likewise, Ca-
mara's conviction under G. L. c. 269, § 7, of building

---

[6]The Commonwealth refers to the Province Laws of 1750-1751, an earlier
codification of this legislation, and argues that G. L. c. 269, §§ 1-8, apply
"with as much force to riots inside a house of correction as [they do] to riots
that take place outside of such institutions." The Province Laws are not
helpful. These laws first define what constitutes an unlawful assembly. See St.
1750-1751, c. 17, § 1 ("any persons, to the number of twelve or more, being
arm'd with clubs or other weapons, of [] any number of persons, consisting of
fifty or upwards, whether armed or not, shall be unlawfully, riotously or
tumultuously assembled"). The laws go on to provide that "if any such
person or persons, so riotously assembled, shall demolish or pull down, or
begin to demolish or pull down, *any dwelling-house or other house parcel
thereof, any house built for publick uses, any barn, mill, malt-house, store-
house, shop or ship*, he or they shall [be punished]" (emphasis added). *Id.* at
§ 3. It cannot be said that an Eighteenth Century "house built for publick
uses" connotes anything other than a building open to the community or
public at large. Further, nowhere in § 3 is any mention of a place of incarcera-
tion or house of correction, facilities understood at the time to be distinct
institutions. See, e.g., G. Jacob, New Law Dictionary (1762) (defining "house
of correction" as "chiefly for the punishing of idle and disorderly Persons;
Parents of Bastard Children, Beggars, Servants running away; Trespassers,
Rogues, Vagabonds").

destruction while unlawfully assembled cannot stand for the reasons previously expressed as to Spearin's similar conviction. We exercise our discretion for reasons of efficient judicial administration because both defendants would undoubtedly move in the Superior Court upon receipt of this decision to have the convictions removed from file, the judgments reversed and the jury verdicts set aside. Of course, both Spearin's and Camara's convictions under G. L. c. 266, § 130, of causing injury to a penal institution, which were placed on file, will stand.

2. We now take up Camara's conviction of hostage taking under G. L. c. 127, § 38A.[7] We reject his contention that the judge abused his discretion by refusing to allow evidence of a fight between Camara and McMullen that occurred on January 30, 2001, some two and one-half months before the inmate uprising. The proffered evidence consisted of a disciplinary report that indicated that Camara had been involved in a fight with McMullen, and testimony from two correction officers concerning the occurrence of the fight. Camara argued that the evidence was relevant to demonstrate animosity between him and McMullen, thus undercutting his ability to participate in a joint venture with McMullen; the venture being an important fact to prove Camara's guilt for hostage taking. Camara made no offer of proof concerning the substance and details of the fight apart from the fact of the fight itself, and offered no evidence of any continued animosity between him and Mc-Mullen after the fight. The judge properly excluded the evidence. See *Commonwealth* v. *Freeman*, 430 Mass. 111, 116 (1999).

3. Finally, we consider Camara's challenges to the judge's instructions on hostage taking under G. L. c. 127, § 38A. Camara did not object to the instructions at trial. "[W]e review for any error that could have created a substantial risk of a miscarriage of justice." *Commonwealth* v. *Sann Than*, 442 Mass. 748,

---

[7]General Laws c. 127, § 38A, provides:

"Any prisoner in any penal or reformatory institution who holds any officer or employee of such institution or any other person as a hostage shall be punished by imprisonment in the [S]tate prison for not more than twenty years."

752 (2004). When instructing the jury on hostage taking, the judge stated:

> "The next indictment has to do with the hostage, and there is a definition under General Laws, chapter 127, section 38A, that any prisoner at any penal or reformatory institution who holds an officer or employee of such institution, or any other person as a hostage shall be punished by imprisonment, etc.

> "Now, what is required of the Commonwealth is to prove that an officer of the correctional facility was held as a hostage. By definition, under our Federal Hostage Taking Act, it's been defined as whoever [seizes] or detains or threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition of release of the person claimed, or attempts or conspires to do so, that is the definition of what a hostage is with respect to this indictment.

> "What is required from the Commonwealth is to prove that, number one, the individual that was taken was a correctional officer and that he was in fact held hostage under those circumstances."

We reject Camara's contentions that the instructions failed to designate Camara as the person the jury must find to have seized or detained the hostage and failed to designate Officer Florent as the person seized. Camara overlooks the instructions as a whole. See *id.* Elsewhere in the instructions, the judge made clear that the Commonwealth was charging Camara under a joint venture theory of hostage taking, and that the hostage taken (by McMullen) was Officer Florent. There was no error.

Camara contends that the instructions relieved the Commonwealth of its burden to prove an essential element, namely, that a person was seized or detained, because the judge failed to employ a conjunctive between the elements of seizing or detaining a person, and threatening to kill, injure or continue to detain the person ("whoever [seizes] or detains *or* threatens to kill, to injure, or to continue to detain another person"). These are

separate elements. The judge's obvious slip of the tongue in his instructions did not create a substantial risk of a miscarriage of justice. The judge pointed out to the jury that McMullen had seized Officer Florent, a fact not contested at trial. The live issue before the jury was whether Camara had engaged in a joint venture with McMullen, not whether Officer Florent had been seized or detained. Because the slight error "did not relate to an issue actively contested at trial, no substantial risk of a miscarriage of justice resulted." *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5 (1986).

We have not previously defined the elements of hostage taking. We now clarify that in a prosecution under G. L. c. 127, § 38A, a judge's instruction to the jury should include the following language:

> "In order to find the defendant guilty of hostage taking, the Commonwealth must prove each of the four following elements beyond a reasonable doubt:
>
> "First, that the defendant is a prisoner in a penal or reformatory institution;
>
> "Second, that the defendant seized or detained another person;
>
> "Third, that the defendant threatened to kill, injure, or continue to detain that person;
>
> "Fourth, that the defendant acted with the purpose and intention of compelling a third person or governmental entity to act in some way, or to refrain from acting in some way."

See *United States* v. *Carrion-Caliz*, 944 F.2d 220, 223 (5th Cir. 1991), cert. denied, 503 U.S. 965 (1992) (defining elements of similar Federal hostage taking statute); 2 L. Sand, Modern Federal Jury Instructions — Criminal 42-27 (2005) (providing pattern jury instruction for violation of Federal hostage taking statute that "is in general use among the circuits").

4. Spearin's and Camara's judgments of conviction of refus-

ing to disperse from an unlawful assembly and building destruction while unlawfully assembled are reversed, and the jury verdicts are set aside. Camara's judgments of conviction of assault on a correction officer and assault by means of a dangerous weapon are reversed, and the jury verdicts are set aside. Camara's judgment of conviction of hostage taking is affirmed.

*So ordered.*