CHRISTOPHER CARLETON *vs.* COMMONWEALTH & others.[1]

Suffolk. April 4, 2006. - December 7, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Employment,* Discrimination. *Anti-Discrimination Law,* Handicap. *Handicapped Persons. Hearing-Impaired Person. Fire Fighter,* Hiring.

In a handicap discrimination case brought by a hearing-impaired individual who sought employment as a municipal fire fighter, the judge properly granted summary judgment in the defendants' favor, where a certain level of hearing acuity was an essential qualification for a municipal fire fighter, and the accommodation the plaintiff sought — the use of hearing aids — was not a reasonable one as determined by the Legislature, through ratification of regulations promulgated under G. L. c. 31, § 61A (governing fitness standards for public employees), and therefore the plaintiff had no reasonable expectation of proving that he was a qualified handicapped person under G. L. c. 151B, § 4 (16) [807-811]; accordingly, the plaintiff's concomitant claim of a violation of his right under art. 114 of the Amendments to the Massachusetts Constitution to be free from employment discrimination based on handicap also lacked merit [811-813].

CIVIL ACTION commenced in the Superior Court Department on July 23, 2002.

The case was heard by *Elizabeth M. Fahey*, J., on a motion for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Harold L. Lichten* (*Shannon Liss-Riordan* with him) for the plaintiff.

*Robert L. Quinan, Jr.*, Assistant Attorney General, for the Commonwealth & another.

*Mary A. Maslowski* for city of Marlborough.

The following submitted briefs for amici curiae:

*Robert S. Mantell* for Massachusetts Employment Lawyers Association.

[1]Personnel administrator of the division of human resources and the city of Marlborough.

*Michele E. Randazzo* for city of Everett & others.

*Beverly I. Ward & J. Lynn Milinazzo-Gaudet* for Massachusetts Commission Against Discrimination.

*Thomas J. Urbelis, Carol Hajjar McGravey, & Margaret J. Hurley* for City Solicitors and Town Counsel Association.

CORDY, J. Christopher Carleton is hearing impaired. He was denied employment as a fire fighter by the city of Marlborough (city) due to his inability to pass a hearing test based on standards promulgated by the Commonwealth's division of human resources (division) at the direction of, and later approved by, the Legislature. See G. L. c. 31, § 61A. As a result, he commenced this action against the Commonwealth, the personnel administrator of the division, and the city,[2] alleging handicap discrimination in violation of G. L. c. 151B, § 4 (16); G. L. c. 93, § 103; and art. 114 of the Amendments to the Massachusetts Constitution.[3] Carleton contends that the division should have allowed him to meet the hearing standards with the assistance of his hearing aids. He does not claim that he could perform the essential functions of the job of a fire fighter without the use of his hearing aids or that the level of hearing acuity set by the medical standards is unnecessary to the performance of those functions.

A judge in the Superior Court granted summary judgment in favor of the defendants, concluding that Carleton could not establish that he was capable of performing the essential functions of a municipal fire fighter with reasonable accommodation, a necessary element of his discrimination claims. In reach-

---

[2] On April 4, 2003, a stipulation entered that recognized that the city of Marlborough (city) "shall be deemed a nominal party in this action and shall not be held liable to either the plaintiff or the state defendants for any monetary damages, costs, or expenses arising out of this litigation." The city is a party to this case because Carleton seeks, as partial relief, employment as a fire fighter in the city.

[3] Carleton also contends that G. L. c. 151B, § 4 (4A) and 4 (5), create liability for the actions of the Commonwealth's division of human resources (division). However, Carleton's original complaint and the memorandum of decision on the motion for summary judgment mention only G. L. c. 151B, § 4 (16), as a ground for such liability. Although Carleton raised the question of the applicability of § 4 (4A) in his opposition to summary judgment, and requested leave to amend his complaint to include a § 4 (4A) claim, it does not appear that the complaint was so amended, or that such claims otherwise became live issues in the case. We thus decline to address them.

ing this conclusion, the judge first accepted the division's determination that a certain level of unaided hearing (reflected in the hearing standard) was an essential function of the job of a fire fighter, and then found that the only accommodation that would enable Carleton to meet the hearing standard — the use of hearing aids — was not a reasonable accommodation because it would force the division and the city to waive or alter that essential function.[4] The judge also concluded that Carleton's art. 114 claim, brought pursuant to G. L. c. 93, § 103, failed because the safety of fire fighters and those they are charged with protecting is an overriding State interest justifying the hearing standards.[5] Carleton appealed, and we granted his application for direct appellate review.[6] We affirm, although on different grounds.[7]

1. *Facts.* We recount the facts in their light most favorable to Carleton. See, e.g., *Mammone* v. *President & Fellows of Harvard College*, 446 Mass. 657, 659-660 (2006), and cases cited. Since childhood, Carleton has suffered "bilateral mild to moderately severe sensorineural hearing loss." He lacks the necessary amplification to hear within a normal decibel range.[8] To correct this deficiency, Carleton has worn hearing aids in both ears from a very early age.

Carleton's first formal experience with fire fighting began in 1997, when, at age seventeen years, he participated in a volunteer

---

[4]The judge further analyzed Carleton's claims using a burden-shifting test. We do not address the applicability of this analytical framework.

[5]The judge noted that her conclusions made it unnecessary "to address several other issues raised by the parties . . . . includ[ing] the timeliness of the plaintiff in filing his complaint with the MCAD [Massachusetts Commission Against Discrimination], the issue of the defendant, [division,] being an 'employer' for purposes of this suit [and] a dispute as to the immunity of the Commonwealth to the claim brought under G. L. c. 93, § 103."

[6]We acknowledge the amicus briefs filed by the Massachusetts Commission Against Discrimination; the Massachusetts Employment Lawyers Association; the City Solicitors and Town Counsel Association; and the city of Everett, together with the towns of Marion and Plainville.

[7]In light of our conclusion that summary judgment was properly granted, we do not reach the Commonwealth's alternative argument that the division is not an "employer" of fire fighters within the meaning of G. L. c. 151B.

[8]Carleton nonetheless has excellent speech discrimination skills — that is, he can readily distinguish words and sounds and, thus, easily understand whatever he does hear.

program sponsored by the fire department of Northborough and the Boy Scouts. Carleton took part in "all aspects of firefighting, except those involving [entrance to 'burning structures']." He "received regular on-the-job fire fighting training at weekly meetings." Carleton learned "to operate fire ladders, fire hoses, [and] water supply"; was taught proper "drafting" technique (how to find and use nonhydrant water supplies); and practiced "using hydrants, driving fire vehicles, setting up lighting and fans on fire grounds, assisting with the rehabilitation of fire fighters, and assisting with salvage operations." In 1998, Carleton became a licensed emergency medical technician (EMT). From August, 1998, to October, 1999, and from July, 2000, to October, 2003, Carleton had been employed by two private ambulance companies as an EMT. In October, 1999, the city also hired Carleton as a 911 emergency dispatcher, a position, it appears, that he continues to hold. In none of these activities was there ever a problem reported regarding Carleton's hearing or communicating with others.

In addition, Carleton served as a "call" fire fighter[9] for the town of Stow from January, 2000, until 2002. As a call fire fighter, he successfully completed the "fire fighter I certification course." Aside from lectures, this course included three days of "structural fire fighting inside a burning structure and outside on the fireground adjacent thereto." During these exercises, Carleton wore his hearing aids as well as head coverings and other equipment. Although sweating, being sprayed intermittently with water, and being exposed to significantly loud background noise, Carleton had no problem hearing or communicating with others, and his hearing aids functioned properly at all times.[10]

On April 29, 2000, Carleton sat for the division's fire fighter

[9]A "call" fire fighter is paid by a town for the fire incidents to which he responds. A call fire fighter, who usually has a primary career, is not required to respond to any particular incident, and does not "man" the fire station waiting for a fire. Rather, he or she is paged when an incident occurs and responds if he or she is able to do so. Generally, call fire fighters are required to respond to some monthly minimum of emergency calls. These fire fighters are not employed under the civil service system and apparently are not required to meet the division's medical standards.

[10]Carleton subsequently held another call fire fighter position, and completed other training programs after the filing of this suit.

civil service examination. He scored a ninety-nine out of a possible one hundred on the examination. Consequently, his name was placed close to the top of the civil service list from which participating governmental units or municipalities hired. In April, 2001, the division notified Carleton that the city would be hiring two fire fighters. Carleton immediately informed the city that he would like to be considered for the positions. Thereafter, the chief of the city's fire department contacted Carleton to explain that a preemployment medical examination had been scheduled for him on June 4, 2001.

The city is a municipality within the civil service system. This status requires it to adhere to the Statewide minimum health and fitness standards for police officers and fire fighters promulgated by the division pursuant to G. L. c. 31, § 61A, first, second and third pars., inserted by St. 1987, c. 697, § 10 (division must devise "health and physical fitness standards which shall be applicable to *all* police officers and firefighters" [emphasis added]).[11] One of these standards focuses on hearing ability. See Division of Human Resources, Medical Standards for Municipal Fire Fighters (Initial Hire), at 4-5. At the time Carleton applied for a fire fighting position with the city, the standard set a maximum hearing deficiency threshold. If the applicant's hearing deficiency exceeded this threshold, he was deemed to have a "Category A" medical condition. See *id.* A "Category A" medical condition is considered incompatible with the performance of the essential job functions of a municipal fire fighter and leads to the applicant's disqualification.[12]

Carleton underwent the preemployment medical examination

---

[11]In relevant part, G. L. c. 31, § 61A, states that the "administrator [of the division], with the secretary of public safety and the commissioner of public health shall establish initial health and physical fitness standards which shall be applicable to all police officers and firefighters when they are appointed to permanent, temporary, intermittent or reserve positions in cities and towns or other governmental units. . . . No person . . . shall perform the duties of such position until he shall have undergone initial medical and physical fitness examinations and shall have met such initial standards."

[12]The division's standards also classified certain less severe hearing problems as Category B medical conditions. A determination that an applicant has a Category B medical condition does not automatically disqualify an applicant from being hired. Rather, such an applicant is required to go through

conducted by the MedWorks, a department of Marlborough Hospital. Part of this examination required Carleton to use headphones to listen and identify different tones and different decibel levels. For the first iteration of the test, the examining nurse did not permit Carleton to use his hearing aids. The nurse then administered the test again, this time allowing Carleton to wear his hearing aids, even though their use was not permitted under the standard.

Three days later, on June 7, the supervising MedWorks physician notified Carleton that he had failed the hearing examination. On June 9, Carleton filed an appeal with the division, stating simply that he is "writing to appeal the failure of [his] Civil Service physical for the Marlborough Fire Department," and that he "[has] worn hearing aids for fifteen years, [is] currently a member of the Stow Fire Department and [has] never had a problem carrying out [his] duties as a firefighter/E.M.T." As a result of this appeal, the division asked Dr. James Ryan, the medical director of Boston Medical Center's occupational and environmental medicine department, to examine the test results.[13]

On June 29, 2001, Dr. Ryan reported to the division and to Carleton that his review of the Medworks examination revealed that while the applicable medical standard allows a maximum "hearing deficit in the pure tone thresholds in the *unaided* worse ear of . . . 40 dB," Carleton had a deficit "in the *unaided* left ear of 75 dB . . ." (emphasis added). And, while the standards permitted a maximum "hearing deficit in the pure tone thresholds in the unaided [other] ear of . . . 25 dB," Carleton had a deficit "in the right ear of 35 dB . . . ." Dr. Ryan noted in his report that sometimes "a single test does not reflect a person's best hearing." He explained, however, that in his opinion the testing was accurate, based on the history of Carleton's disability and on the "wide margin" by which Carleton failed the test.

---

an individualized analysis of his or her condition in order for the division to determine whether he or she can perform the essential functions of a fire fighter.

[13]Dr. Ryan was under contract with the division to serve as an independent medical review officer in such circumstances.

Dr. Ryan also reported that Carleton "wears hearing aids . . . and has submitted the results of the audiogram performed while wearing hearing aids," but that "[h]earing aids are not permitted to be used . . . in order to meet the requirements of the Medical Standards." He explained the reasons for this prohibition: "Hearing aids do not permit accurate localization of the direction of sounds; can be swamped by loud background noise; may be subject to failure due to electronic malfunction or weak batteries during an emergency situation; and may act as radio receivers, picking up interference from nearby radio transmitters." Dr. Ryan added that "[l]oss of effective hearing in such a situation . . . would place the life and safety of the fire fighter and the public in danger." Finally, Dr. Ryan pointed out that "even if hearing aids were permitted under the Medical Standards," the results of the test administered with hearing aids (on June 4, 2001), shows that "Carleton still fails to meet [the division's medical standards] . . . in both ears."

On July 16, 2001, the division sent Carleton a letter denying his appeal because he had "failed to meet the Public Safety Medical Standards for Municipal Firefighters." The division upheld "the examining physician's assessment that [Carleton] posess[es] a Category A medical condition which precludes [him] from performing the essential functions of a firefighter." The letter also informed Carleton that he was "entitled to a second examination within sixteen weeks" of the denial. According to his affidavit, Carleton understood this to mean that he could be "reexamined . . . using the same test under the same conditions." Carleton did not seek a reexamination.

On August 17, 2001, Carleton received another notice from the division that the city was hiring fire fighters. He responded by sending in the required card signifying his interest in these positions, but received no response from the division or the city. In September, 2001, the city filled the positions with persons whose placement on the civil service list was below Carleton's.

On February 25, 2002, Carleton filed an employment discrimination claim with the Massachusetts Commission Against Discrimination (MCAD), alleging handicap discrimination in violation of G. L. c. 151B, § 4 (16). Carleton faulted the division and the city for "fail[ing] to allow [him] to wear hear-

ing aids while taking the hearing test to determine if he met [the division's] hearing standards" and explained that he was "a qualified individual with a handicap who is capable of safely performing the essential functions of the job of firefighter with the reasonable accommodation of being permitted to wear hearing aids."

On March 8, 2002, Carleton visited Dr. David Citron, a hearing expert whom he had retained in connection with his MCAD complaint. Dr. Citron informed him that a hearing test with headphones on a person wearing Carleton's hearing aids (like the second test administered by MedWorks on June 4, 2001) would yield invalid results. Dr. Citron performed a full audiological evaluation on Carleton, both with and without the use of hearing aids. The results of this evaluation appeared to show that even with the use of hearing aids, Carleton's hearing did not meet the division's standards. However, Dr. Citron explained that Carleton's hearing aids did not fit his ears perfectly during this examination and that the misfit likely accounted for the test results. At the suggestion of Dr. Citron, Carleton's hearing aids were sent back to the manufacturer for repair. On May 9, 2002, Carleton visited Dr. Citron for a follow-up evaluation. By that time, Carleton's hearing aids had been repaired and fit his ears properly. Dr. Citron examined Carleton with his hearing aids, and concluded in a written report dated June 3, 2002, that Carleton had the hearing ability necessary to "perform the duties of a fire fighter with no difficulties."

On July 12, 2002, during the pendency of Carleton's MCAD claim, the division sent him information that the city was hiring six "permanent intermittent firefighters."[14] Carleton filed suit against the defendants on July 23, 2002. The following day, Carleton's attorney wrote to the city's fire department and the division, enclosing a copy of Dr. Citron's June 3 report, advising that Carleton had filed a discrimination action against them in the Superior Court; that Carleton expected to be considered for the intermittent fire fighter positions; that Carleton met the division's hearing standard when tested properly while wear-

---

[14]Persons hired as permanent intermittent fire fighters by a municipality are placed on a separate reserve waiting list and hired, when job openings appear, before the city consults the full civil service list.

ing hearing aids; and that Carleton had to be allowed to take the preemployment hearing examination with the assistance of his hearing aids.

Thereafter the city council approved Carleton's appointment as a permanent intermittent fire fighter, subject to a successful medical examination, which was scheduled to take place on October 7, 2002. Carleton was again examined by MedWorks. He was not permitted to wear his hearing aids during the hearing test. The result of the test again placed him into Category A. Consequently, when the city presented the final list of appointments to the division on October 28, 2002, Carleton's name was not among them. Accompanying this final list, the city submitted a letter to the division making explicit that Carleton was not hired because he failed to meet the division's hearing standard.

2. *The division's standards.* As of the mid-1980's, the statutory framework governing the civil service system gave the Commonwealth's personnel administrator discretion to "establish physical requirements, in addition to those established by statute and rule, as prerequisites for appointment to any civil service position" and to "require an applicant . . . to submit to physical examination prior to [his or her] appointment." G. L. c. 31, § 21, inserted by St. 1978, c. 393, § 11. Pursuant to this authorization, the division issued guidelines concerning, inter alia, the rejection of candidates based on medical impairment. For example, in 1984, the guidelines, which "[a]ppointing authorities [were] required to use . . . in the administration of their own medical examinations," explained that "[t]he causes for rejection [due to deficient hearing were] [a]ll chronic or acute diseases of the external auditory canal, mastoids, middle ear and tympanic membrane that are non-remediable" and "Meniere's disease." The guidelines also noted that an "[a]pplicant must be able to hear the whispered voice in each ear at twenty feet. If not, [the] candidate must undergo full audiometric examination." See Department of Personnel Administration, Revised Physical Standards for Public Safety Positions (May 1984). The method by which such guidelines were devised — or even whether there existed any set method for devising them — is unclear.

In 1987, the Legislature passed and the Governor signed the pension reform act. St. 1987, c. 697. This new law provided that "[t]he administrator, with the secretary of public safety and the commissioner of public health shall establish initial health and physical fitness standards which shall be applicable to all police officers and firefighters when they are appointed to" civil service positions. G. L. c. 31, § 61A. The law mandates that "[s]uch standards . . . be established by regulations promulgated by the administrator after consultation with representatives of police and firefighter unions, and the Massachusetts Municipal Association." *Id.* The law specified that *"[s]uch initial health and physical fitness standards shall be rationally related to the duties of such positions and shall have the purpose of minimizing health and safety risks to the public, fellow workers and the police officers and firefighters themselves"* (emphasis added). *Id.* The law made plain that "[n]o person appointed to a . . . police or firefighter position after [January 1, 1988[15]] shall perform the duties of such position until he shall have undergone initial medical and physical fitness examinations and shall have met such initial standards."[16]

General Laws c. 31, § 61A, also mandated that the division "establish in-service health and physical fitness standards which shall be applicable to all police officers and firefighters in permanent, temporary, intermittent, and reserve positions." As was the case with the initial standards, the 1987 statute limited the reach of these standards to persons hired after January 1, 1988.[17] Police officers and fire fighters hired after that date were to undergo examination at least every two years.[18]

The Legislature further required that the division's health and

---

[15]The January 1, 1988, trigger date was later amended. See St. 1995, c. 206, § 1 (Nov. 17, 1995); St. 1996, c. 151, § 171 (July 1, 1996).

[16]General Laws c. 31, § 61A, does allow municipalities to adopt, subject to collective bargaining agreements, additional health and physical fitness standards provided they, like the division's standards, are "rationally related to the duties of [the relevant job] and . . . have the purpose of minimizing health and safety risks."

[17]The January 1, 1988, trigger date for in-service standards was amended in lockstep with the January 1, 1988, trigger date for initial medical standards. See note 19, *supra.* The current date for the applicability of in-service medical standards is November 1, 1996. See note 15, *infra.*

[18]The two-year interval was later amended to a four-year interval. See St.

physical fitness standards were to be promulgated as proposed regulations and transmitted to the Legislature before attaining the force of law. Specifically, the division was to "submit regulations promulgated pursuant to this section to the clerks of the house of representatives and senate, who shall refer said regulations to the appropriate standing committee of the general court. . . . If the general court takes no final action relative to said regulations within forty-five days . . . said regulations shall be filed with the state secretary . . . . No such regulation shall take effect until filed with the state secretary . . . ." G. L. c. 31, § 61A.[19]

Although it is unclear from the record and the regulatory history precisely when standards were first promulgated for fire fighters pursuant to the 1987 pension reform act, in 1997 the personnel administrator reported in a letter to the clerk of the House of Representatives that the division had adopted standards "synonymous with and identical to the National Fire Protection Association's (NFPA) Document 1582, Medical Requirements for Firefighters." The NFPA is the preeminent fire code and standards organization in the United States, and NFPA Document 1582 is "a standard that has been adopted by fire fighting organizations throughout the United States." *Sicard* v. *Sioux City*, 950 F. Supp. 1420, 1425 (N.D. Iowa 1996).[20]

In 1995, the division began exploring the need to update its

2000, c. 31, § 3.

[19]The parties have not provided evidence that the health and physical fitness standards were ever codified in the Code of Massachusetts Regulations. Nonetheless, as required by the statute, the standards were properly transmitted to the Legislature for review and subsequently "placed on file" with the Secretary of State. We thus do not concern ourselves with the precise classification of the division's standards.

[20]"The National Fire Protection Association [NFPA] is a non-profit organization comprised of fire fighting professionals, occupational specialists, engineers, physicians, and inspectors. The NFPA develops guidelines or standards on numerous topics ranging from building codes and boilers to hazardous materials and protective clothing. The NFPA has developed physical standards for the appointment of firefighters. These standards were the product of consultation between physicians and occupational specialists experienced with the demands and hazards of firefighting. . . . Many of the standards developed by the NFPA are adopted by [the Occupational Safety and Health Administration] and state agencies. It is estimated that several thousand fire departments use the NFPA's standards for hearing." *Nagel* v. *Boston Fire Dep't*, 18 M.D.L.R. 221, 222 (Oct. 18, 1996). See *Miller* v. *Sioux*

standards because of concerns, according to the personnel administrator's letter, that the old standards "no longer represent[ed] the latest research of the relationship between medical conditions and categories and actual job performance" and "need[ed] revision to keep pace with developing case law around the Americans With Disabilities Act." To facilitate this task, the division formed a panel of experts (senior officers in city fire departments, physicians, a physical therapist, and a physiologist). The updating process took two years to complete.

The panel engaged a consulting firm to perform a job task analysis for the position of fire fighter (and police officer). The job task analysis "included interviews and panel review sessions with job incumbents and supervisors, and the administration of surveys to representative samples of incumbent[] [fire fighters]. The surveys asked respondents to provide judgments regarding the performance, frequency, importance, amount of time, physical effort and speed requirements of the job tasks and physical tasks; the cognitive and physical abilities required to perform major task groups or duties; and the importance of the various abilities relative to one another." The analysis was used to "develop and validate . . . medical standards for selection and retention of municipal fire fighting and police personnel of all ranks." Consistent with the division's statutory mandate, the panel made plain to the consulting firm that the "standards must be based on the physical abilities required to perform the essential functions of [the] jobs" and that the "standards should minimize adverse impact on women and minorities." The panel added to this the following requirements:

> "The medical standards shall identify all biological systems involved in performing the essential functions of fire fighter and police occupations in Massachusetts. All relevant biological systems must be linked to essential functions of [the] jobs of fire fighters and police officers.
>
> "The standards shall specify all medical conditions affecting those biological systems that would preclude a candidate's ability to perform the essential functions of the jobs of fire fighter and police officer.

*Gateway Fire Dep't*, 497 N.W.2d 838, 842 (Iowa 1993).

"The standards shall identify acceptable levels of functioning for biological systems.

"The health standards shall be developed based on consultation with medical experts and subject matter experts in the fields of fire fighting and law enforcement."

In December, 1995, the consulting firm issued a report in which it recommended new minimum medical standards. The report noted that "the purpose of [the] standard[s] [was] to aid examining physicians in the selection and retention of public safety personnel . . . based on medical ability to perform essential job functions without risk to self or the public." The report explained that its recommendations were based on a "careful and systematic determination of . . . essential job functions, the physical and physiological constructs necessary to perform those functions, and absolute and relative exclusionary criteria to be used during medical screening."

The standards proposed in the report divided medical deficiencies into two categories — Category A and Category B. "A candidate or current fire fighter shall not be certified as meeting the medical requirements of this standard if the physician determines that the candidate has any Category A medical condition [and] a candidate or current fire fighter shall not be certified as meeting the medical requirements of this standard if the physician determines that the candidate has a Category B medical condition that is of sufficient severity to prevent the candidate from performing the essential functions of a fire fighter without posing a significant risk to the safety and health of him/herself or others." Included in the report's recommendations were medical standards concerning a great number of biological systems (e.g., eyes, nose, mouth and throat, gastrointestinal organs, brain and nerves, and cardiovascular system). Also included were standards regarding an applicant's ability to hear.

As required by law, the division consulted representatives from the fire fighter unions and the Massachusetts Municipal Association regarding the conclusions of the report. Thereafter, it promulgated proposed new standards. Most of the report's recommendations, and the report's proposed hearing standards

in particular, were accepted by the panel and by the division and included in the final proposed standards. In 1997, the proposed standards were transmitted by the division to the public service committee, a standing committee of the General Court, for comment and further action. The committee recommended to the House of Representatives and the Senate that the standards be "placed on file" with the Secretary of the Commonwealth. The House and Senate accepted this recommendation. See 1997-1998 House J. 1394; 1997-1998 Senate J. 1414; 1997 Senate Doc. No. 1757. The standards were then filed with the Secretary of the Commonwealth and became effective.

The 1997 standards were operative in 2001 when Carleton was first denied employment as a fire fighter. Under these standards, a "hearing deficit in the pure tone thresholds in the unaided worse ear of greater than 40 dB at 500 Hz, 1000 Hz, 2000 Hz, or 3000 Hz, [or a] hearing deficit in the pure tone thresholds in the unaided better ear of greater than 25 dB at 500 Hz, 1000 Hz, 2000 Hz or 3000 Hz" constituted a Category A medical condition. The standard did not allow an applicant to overcome the Category A classification by using hearing aids.[21]

The division began considering revisions to its standards in 2001. It again hired a consulting firm to assist it in "updat[ing] the existing medical standards for the positions of Firefighter and Police Officer within the State of Massachusetts" based on an updated job task analysis report. This revision process included the selection of new expert panels in the fields of vision and hearing. It culminated in 2003 with the promulgation of new standards (including revisions to the hearing standard) and the acceptance of the standards by the Legislature that same year.

---

[21]Also operative in 2001 were the division's in-service standards that had been accepted by the Legislature in 2000. The in-service hearing standards were identical to the initial hiring standards. The publication of these standards was contingent on the passage of legislation that amended certain provisions of G. L. c. 31, § 61A. Statute 2000, c. 31, was enacted on February 18, 2000. That legislation offered more protections from terminations to veteran civil servants than had previously been in the statute, including increasing the period between medical examinations from two years to four years and allowing a veteran civil servant to continue performing his duties and receiving payment until he failed two examinations, the latter not having to occur until thirty-two weeks after the civil servant's initial failure. See St. 2000, c. 31, §§ 3, 5.

The consulting firm's report, issued in June, 2002, describes the findings of the job task analysis, the "legal information that would be useful in updating the medical standards," and the "medical standards revision process." The revision process was described as follows:

> "The basic review process involved mailing the existing standards to a number of medical experts for review and comment. These experts included several individuals who participated in the development of the original standards for Massachusetts. In addition, two areas of the standards were targeted for in-depth review and evaluation. The Ears and Hearing section and the Eyes and Vision section of the standards received the added attention. Specifically, panels of experts met in Boston to discuss and edit each of these sections of the standards in a half-day session. Both methods lead [*sic*] to the updating of the existing standards and the identification of absolute and relative exclusionary criteria to be used during future medical screening. All decisions were tied to essential job functions . . . to ensure the relevancy of the resulting physical and physiological constructs that would be part of the updated medical standards."[22]

The consulting firm and the expert panels were cognizant of the requirements of Massachusetts and Federal discrimination laws. The report noted that the approach the consulting firm selected to ensure test components are linked to essential job functions "satisfies the [Americans with Disabilities Act] criterion and . . . is required by the 1991 Civil Rights Act." The report also emphasized that "[i]n view of ADA, it [was] important to have a clear definition of what constitutes the essential functions of the job" and that the method it used to explore essential job functions appeared to be preferred by the Equal Employment Opportunity Commission. Finally, the report

[22]Although Carleton alleges that the expert hearing panels, which formally met on May 29, 2002, to finalize its recommendations, were created simply to offer a superficial legal response and defense to his challenges, the consulting firm's report suggests that this was not the case. The expert panels were created as part of a process that began in 2001, long before Carleton filed his complaint with the MCAD in February, 2002, and this action in the Superior Court in July, 2002.

noted that "all medical certification decisions must be based on an individual's ability to perform the essential functions of the job without risk."

The panel on hearing standards agreed that an "[a]dequate ability to hear is critical for communicating effectively as a police officer or fire fighter." The members also agreed that "[f]ire fighters are more likely to experience problems with hearing aids during the performance of their duties at the fire scene. A hearing aid can fail due to being soaked or from excessive perspiration, preventing the wearer from performing a critical job function during the failure period.[23] It is possible the failure could occur during a circumstance that is life threatening. Police officers are not likely to encounter these types of conditions while performing their normal work duties."

Based on these findings, the panel recommended that police officer candidates be permitted to use hearing aids to meet the hearing standard, but that fire fighter candidates not be permitted to do the same, unless the hearing aids used were implantable hearing aids.[24] Thus, while an applicant to the police force would be permitted to pass the hearing standards "aided based on sound field testing" (as opposed to booth testing), a fire fighter applicant was required to "pass . . . unaided" or with the use of implantable hearing aids "based on sound field testing."[25]

The panel also agreed that "[l]ocalization of sound (determining where it is coming from) is not critical for policing or fire

[23]The experts added that "[t]here are many factors related to fire fighting activities that could lead to failure of an external hearing aid including sweat, humidity, acoustic feedback (when worn under protective headgear), the unit being soaked, and the high levels of background noise . . . ."

[24]Implantable hearing aids are not, for all practical purposes, presently available. Carleton wears "in-the-ear" hearing aids.

[25]Although not determinative, the 2003 NFPA 1582 Standard, like the division's 2003 standards, does not permit fire fighting candidates or fire fighters to use hearing aids to meet the mimimum hearing requirements. The NFPA 1582 Standard explains that "[h]earing aid use is *not* considered a reasonable accommodation . . ." (emphasis in original). Among several reasons the NFPA 1582 Standard cites for justification are the following: "Hearing aids are not calibrated to function in areas of high background noise (fire scene, rescue scene, traffic), during radio transmissions, [and] are not reliable after submersion or heavy exposure to water."

fighting because equipment and other background noise can hinder [the] ability to do so, and other cues can be used." They further found that "[h]earing loss in fire fighters is . . . common over time"; that "[m]any incumbents are able to continue to perform their work, even with impaired hearing"; and that "[t]here is little evidence that modest hearing loss is incompatible with safe performance of essential job functions." Consequently, although the newly proposed hearing standard contains a Category A hearing deficiency threshold ("Hearing deficit in pure tone thresholds in both ears, the deficit in each ear averaging 35 dB HL or worse at 500, 1000, 2000, and 3000 Hz)," an applicant who is assessed with a Category A medical problem is no longer automatically excluded from service. Rather, if a person is diagnosed with a Category A problem and still wishes to be considered for appointment, they are given a full audiological examination. This test can be passed if an applicant has "[p]ure tone thresholds in [the] better ear indicating average hearing levels at 500, 1000, 2000, and 3000 Hz to be lower than 35 dB HL, and performance score of 80% or better on the speech discrimination test in the better ear."

The new hearing standard allows the medical certification of more persons suffering from hearing loss than would have been certified under the 1997 standard. Nonetheless, Carleton would pass neither standard without the use of his hearing aids.

3. *Carleton's G. L. c. 151B claim.* In 1983, the antidiscrimination act (G. L. c. 151B) was amended to protect handicapped persons from employment discrimination. See St. 1983, c. 533, § 6, inserting G. L. c. 151B, § 4 (16). Section 4 (16) makes it unlawful, with certain exceptions, "[f]or any employer, personally or through an agent, to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation . . . ." Whether an accommodation is reasonable depends on whether it would "impose an undue hardship on the conduct of the employer's business." Whether there is an undue hardship depends on the consideration of "factors" that the statute says "include," inter alia, (1) the size of the busi-

ness; (2) the type of operation; and (3) the nature and cost of the accommodation.

Section 4 (16) permits employers to adopt "[p]hysical or mental job qualification requirement[s] with respect to hiring" so long as they are "functionally related to the specific job . . . and . . . consistent with the safe and lawful performance of the job." G. L. c. 151B, § 4 (16). It also provides that "an employer may condition an offer of employment on the results of a medical examination conducted solely for the purpose of determining whether the employee, with reasonable accommodation, is capable of performing the essential functions of the job." *Id.*

"The public policies underlying G. L. c. 151B, § 4 (16), are clear: to protect 'handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing others to significant health and safety risks." *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 240 (2001).

Consistent with § 4 (16), G. L. c. 31, § 61A, enacted in 1987, directs the division to promulgate medical standards that are "rationally related to the duties of [fire fighter] positions," for the "purpose of minimizing health and safety risks to the public, fellow workers and firefighters themselves." Fire fighters perform highly demanding and exceptionally dangerous work, requiring that a wide range of physical abilities be readily available under potentially catastrophic conditions. It is not surprising that the Legislature would specifically seek, through § 61A, to ensure that employees in this category of civil service would be able to perform their work safely and protect the public through the establishment of uniform minimum health and physical standards for their employment.

That the division proceeded to develop and update its medical standards in accord with this legislative directive is indisputable. The Legislature's ratification of the standards at each point along the way confirms that the standards were consistent with the purposes behind the enactment of the statute, and had the full force of law. *Commonwealth* v. *B & W Transp. Inc.*, 388 Mass. 799, 803 (1983), and cases cited (regulations

promulgated pursuant to statutory authority treated with same deference as statutes).[26]

Where two statutes relate to the same subject matter and are not irreconcilable, "they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose." *Commonwealth* v. *Spearin*, 446 Mass. 599, 604 (2006), quoting *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975). We see no irreconcilable conflict between G. L. c. 151B, § 4 (16), and the regulations ratified by the Legislature under G. L. c. 31, § 61A, notwithstanding the fact that the standards do not permit the use of nonimplantable hearing aids to satisfy the minimum hearing requirements necessary to the performance of the essential functions of a fire fighter.

In an area where public safety is paramount, we do not read § 4 (16) to preclude a determination by the division (rather than by a judge or a jury) that an accommodation is not reasonable because it would impose an undue hardship on the conduct of the employer's (in this case the public's) business due to the dangerous type of work involved and the nature of the risk to public safety that would arise if the accommodation failed (leaving the fire fighter without adequate hearing function) at a critical moment in the work.[27] This is particularly so where such a determination is based on consultations with medical and occupational experts in the field; is not the product of

[26]The legislative oversight is not simply theoretical. "The Legislature does not ordinarily display this level of interest in administrative regulations. The fact that the Legislature [did so] here strongly indicates that it anticipates that the regulations will be substantive and wishes to be in a position quickly to alter anything it deems inconsistent with desirable regulatory policy regarding the subject matter." *Postal Community Credit Union* v. *Commissioner of Banks*, 61 Mass. App. Ct. 563, 571-572 (2004) (statute grants Commissioner of Banks authority to approve or disapprove entity's proposed conversion from credit union to mutual savings bank where commissioner's regulation for approval or disapproval promulgated under statute must be transmitted to and accepted by General Court).

[27]While the question whether an accommodation is reasonable is usually viewed as a question of fact for the jury, courts have also concluded that certain types of accommodations are not reasonable as a matter of law. *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 454-455 (2002) (summary judgment affirmed where court concluded that request for indefinite leave not reasonable).

prejudice, stereotypes, or unfounded fear; and is ratified by the Legislature.[28]

Read harmoniously in this fashion, the statutes are consistent with and promote the Legislature's purposes and policies of protecting "handicapped individuals from deprivations based on prejudice . . . while giving appropriate weight to . . . avoiding exposing others to significant health and safety risks." *Dahill* v. *Police Dep't of Boston, supra* at 240, quoting *Cox* v. *New England Tel. & Tel. Co.,* 414 Mass. 375, 383-384 (1993).[29]

Where, as here, a level of hearing acuity reflected in the hearing standard is an essential qualification for a municipal fire fighter (a determination not disputed by Carleton) and the accommodation sought (the use of hearing aids) is not a reasonable one as determined by the Legislature, Carleton has no reasonable expectation of proving that he is a qualified handicapped person.[30]

---

[28]The standards as they existed in 2001 plainly bore a reasonable relation to a permissible legislative objective. That might not always be the case. If the standards were not updated over time to reflect improvements in hearing aid technology, changes in fire fighting functions, or a shifting consensus on the safety of the use of hearing aid devices, they might, at some point, no longer satisfy the basic standard of rationality. See *Goodridge* v. *Department of Pub. Health,* 440 Mass. 309, 330 (2003) ("Any law failing to satisfy the basic standards of rationality is void").

[29]This case does not require the court to decide whether, or when, an employer not covered by G. L. c. 31, § 61A, can categorically apply fitness standards to exclude potential employees. In such circumstances, blanket exclusions are generally disfavored. *Cox* v. *New England Tel. & Tel. Co.,* 414 Mass. 375, 383-384 (1993) ("In most cases" trial judge "will need to conduct an individualized inquiry" to determine whether an individual is a "qualified handicapped person" under G. L. c. 151B, § 1 [16]). See *School Bd. of Nassau County* v. *Arline,* 480 U.S. 273, 287 (1987) (individualized consideration required "in most cases" claiming handicap discrimination under § 504 of the Rehabilitation Act of 1973). The present case involves a discrete area — fitness standards for public safety employees — where the Legislature has fashioned a deliberate statutory scheme in § 61A. Upholding the application of § 61A to Carleton does not diminish the force of decisions such as the *Cox* case that, in general, discern a strong presumption in G. L. c. 151B against categorical exclusions from employment based on handicap.

[30]Carleton claims that only novice fire fighters, and not veterans, are subject to medical standards. From the record and the regulatory history of the division's standards, it appears that many veteran fire fighters are required to submit to an examination governed by substantially similar medical standards (including the hearing aid prohibition). While it is correct that fire fighters hired prior to November 1, 1996, are not required to submit to such examina-

Summary judgment was therefore properly granted. *Kourouvaci-lis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).[31]

4. *Carleton's G. L. c. 93, § 103, and art. 114 claim.* Article 114 was ratified in 1980 by the citizens of the Commonwealth and provides that "[n]o otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth." While the amendment does not further explain or define the meaning of the term "otherwise qualified handicapped individual," its language is nearly identical to that of the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794 (2000), from which it was largely taken, and which similarly applies to "otherwise qualified handicapped individual[s]."[32] *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 159 & n.4 (1989). We have previously concluded that in the employment context, "[t]here is no significant distinction between" the language used in the Federal Rehabilitation Act and "the term 'qualified handicapped person' in [§ 4 (16) of] G. L. c. 151B."[33] *Cox* v. *New England Tel. & Tel. Co.*, *supra* at 384. We now further conclude that, for purposes of art. 114, an "otherwise qualified handicapped

tions, the history of G. L. c. 31, § 61A, and the adopted regulations suggest that the exclusion of fire fighters hired before November 1, 1996, was a compromise made in order to secure the passage of the legislation and subsequent amendments. That such a compromise was necessary in order to usher in the medical standards does not undercut the necessity of the standards. This is certainly the case where all current fire fighters will eventually have been hired after the trigger date and will thus be subject to the same medical standards. Cf. *Commonwealth* v. *King*, 374 Mass. 5, 16 (1977), quoting *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955) ("legislature may select one phase of one field and apply a remedy there, neglecting the others").

[31]Because we have concluded that Carleton's G. L. c. 151B claim fails, we need not address the Commonwealth's contention that Carleton failed to file a timely MCAD charge and, thus, that some alleged acts of discrimination are time barred.

[32]Neither party to this case disputes that Carleton is a handicapped individual. The operative question, at least at the threshold, is whether Carleton is "otherwise qualified."

[33]As noted above, § 4 (16) was added to G. L. c. 151B in 1983, shortly after the adoption of art. 114.

individual" in the employment context is one "capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." G. L. c. 151B, § 1 (16).[34]

"If a violation of art. 114 rights can be redressed within the ambit of an existing statute . . . there is a well-worn procedural path to relief for such a violation." *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction, supra* at 159. "Actions to enforce rights guaranteed by art. 114 . . . are authorized by G. L. c. 93, § 103." *Shedlock* v. *Department of Correction*, 442 Mass. 844, 852 n.6 (2004).[35] However, we have repeatedly held that if "G. L. c. 151B is or was available to the plaintiff, the plaintiff would have no viable c. 93, § 103, claim." *Agin* v. *Federal White Cement, Inc.*, 417 Mass. 669, 672 (1994), citing *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580 (1994). See *Guzman* v. *Lowinger*, 422 Mass. 570, 571 (1996); *Tate* v. *Department of Mental Health*, 419 Mass. 356, 365 (1995); *Cargill* v. *Harvard Univ.*, 60 Mass. App. Ct. 585, 604 (2004).[36]

Here, the challenge Carleton brings relates to the denial of employment, and falls squarely within the ambit of G. L. c. 151B. We do not construe Carleton's art. 114 right to be free from employment discrimination based on handicap more

---

[34]Consistent with the United States Supreme Court's interpretation of the Federal Rehabilitation Act's use of the term "otherwise qualified" in *Southeastern Community College* v. *Davis*, 442 U.S. 397, 406 (1979), we construe "otherwise qualified" to mean qualified in spite of (as opposed to except for) a handicap.

[35]General Laws c. 93, § 103, provides, in relevant part: "Any person within the Commonwealth, regardless of handicap or age as defined in [G. L. c. 151B,] shall, with reasonable accommodation, have the same rights as other persons . . . to the full and equal benefit of all laws and proceedings . . . including, but not limited to, the rights secured under [art. 114]."

[36]For Federal cases addressing the same issue, see *Woods* v. *Friction Materials, Inc.*, 30 F.3d 255, 264 (1st Cir. 1994), citing *Martin* v. *Envelope Div. of Westvaco Corp.*, 850 F. Supp. 83, 93-94 (D. Mass. 1994) (collecting Federal and State cases holding that G. L. c. 151B provides exclusive remedy for employment-related discrimination claims); *DeFazio* v. *Delta Air Lines, Inc.*, 849 F. Supp. 98, 103 (D. Mass. 1994) (discussing reasoning of State and Federal cases that hold G. L. c. 151B to be exclusive remedy for work discrimination claims).

broadly than that which is provided him in § 4 (16).[37] Because he is unable to establish that he is a "qualified handicapped" person under that statute, Carleton's constitutional claim must fail as well.

Summary judgment for the defendants is affirmed.

*So ordered.*

---

[37]The constitutional right is broader than the rights afforded in G. L. c. 151B in the sense that it applies to other contexts (including other employment contexts) not covered by that statute. See *O'Connell* v. *Chasdi*, 400 Mass. 686, 693 & n.9 (1987) (concluding that employment discrimination violates rights secured by Constitution where G. L. c. 151B would not apply because employer had fewer than six employees). This is not such a case.