# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1583

_____

| | |
|---|---|
| Equal Employment Opportunity Commission, | * * * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Western District of Missouri. |
| Wal-Mart Stores, Inc., | * |
| | * |
| Appellee. | * |

_____

Submitted: November 16, 2006
Filed: February 13, 2007

_____

Before RILEY, HANSEN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

The Equal Employment Opportunity Commission (EEOC) brought this action against Wal-Mart Stores, Inc. ("Wal-Mart"), alleging that Wal-Mart violated the Americans with Disabilities Act (ADA). The EEOC contends that Wal-Mart improperly refused to hire Steven Bradley because of mobility limitations caused by cerebral palsy. The district court granted Wal-Mart's motion for summary judgment, concluding that (1) Bradley's impairment rendered him unqualified for the positions of greeter and cashier and that (2) insufficient evidence existed from which a reasonable factfinder could conclude that Wal-Mart's reasons for not hiring Bradley were pretextual. We hold that material facts remain in dispute and therefore reverse.

## I. *Background*

We recite the facts in the light most favorable to the EEOC, the nonmoving party. Cerebral palsy limits Bradley's use of his legs. The condition forces Bradley to use forearm crutches for short-distance walks and a wheelchair for longer distances. Standing for more than 10 to 15 minutes is also difficult for him. With support, however, Bradley can walk, climb stairs, and get on and off of a stool—albeit slowly. Bradley's condition also restricts his third and fourth fingers, as they generally work as a unit and preclude him from using his fourth finger, for example, when typing. His limited hand dexterity, however, does not limit his ability to write, hold things, or complete "daily living" tasks, such as carrying laundry or groceries or doing his own housekeeping. Bradley's grip strength is normal, and his arm strength allows him to lift heavy objects even from his wheelchair.

Bradley applied for a "Greeter/Customer Assistant" position at his local Wal-Mart in July 2000 while he was employed as a proofreader at Banta Publishing, Inc ("Banta").[1] On his application, Bradley indicated that he was seeking part-time employment, was willing to work from 4:30 p.m. until close during the weekdays, and stated that working on weekends was "negotiable." In response to a question on the July 2000 application asking whether Wal-Mart could contact Bradley's current employer, Bradley checked "no," explaining that his employer would fire him if it found out that he was seeking part-time work. Wal-Mart did not hire Bradley in July 2000.

In early 2001, Wal-Mart expanded its store in Richmond, Missouri, into a Supercenter, which required it to hire additional employees. Wal-Mart received hundreds of applications for the new positions. To facilitate the hiring process, Wal-Mart created a hiring committee, comprised of several new managers, including Maxine Hicks, to assist in conducting interviews and reviewing applications. The

---

[1]From June 1998 to June 2001, Bradley worked as a proofreader for Banta.

committee screened applications based primarily on work history and availability. If an application made it past the initial screening process, a member of the committee would schedule an interview. The committee member who interviewed the applicant, however, was not necessarily the member who screened the application.

After the initial interview, if the committee member considered the applicant a potential hire, he or she would place the applicant's application in a pile so that the applicant's references could be checked. Store Manager David Penny normally made all hiring decisions. However, during the transition to a Supercenter, Personnel Manager Janet Daugherty made the hiring decisions, including whether to conduct a second interview based on the recommendations of the committee member who conducted the initial interview.

In February 2001, Bradley submitted an application to work at the Wal-Mart Supercenter. On the application, he indicated that he was applying for the position of "Associate/Any Department," was seeking full-time or part-time employment, and was willing to work from 4:00 p.m. to 10:00 p.m. every evening, including Saturday and Sunday. Bradley's application indicated that he had completed two years of college. Bradley's employment history showed that he currently worked at Banta as a proofreader and that he had previously worked at Ray County Fellowship as an administrator. Bradley did not answer the application question asking whether Wal-Mart could contact his employer.

Based on his application and resume, Bradley was called in for an interview. He arrived for the interview in his wheelchair, and Hicks conducted the interview. Hicks questioned Bradley about his physical ability to work from his wheelchair and told him that she thought he was "best suited for a greeter job."

The Wal-Mart store did not hire Bradley; however, the parties dispute who actually made the decision not to hire Bradley. The EEOC cites EEOC Investigator

Michael Katz's interview notes to support its position that a factual dispute exists as to whether Hicks or Daugherty made the decision. In his interview notes, Katz wrote that Hicks indicated that the "primary reason" for not hiring Bradley was "the absence of a history of job stability," and a "secondary factor" in "her decision" was "limits on his availability" because working weekends was "negotiable." In her deposition, however, Hicks stated that she had "no idea" why Bradley was not hired. In contrast, Daugherty testified that she was the decisionmaker who decided not to hire Bradley for a position. Wal-Mart maintains, based on Daugherty's statement, that Daugherty, not Hicks, made the decision not to hire Bradley.

In her deposition, when asked why Wal-Mart did not hire Bradley after his February 2001 application, Daugherty testified that Bradley was not hired for a position based on "a lot of factors." She stated that the "main reason" that Bradley was not hired was because of his job history, as she was personally aware of short-term jobs that Bradley had held in their "small town" that he failed to list on his application. Those "short-term jobs" included Bradley working at a Texaco service station ("Texaco"), at Shirkey Leisure Acres ("Shirkey"), at Station Casino, and as a police dispatcher. When asked whether she had information that Bradley had worked at Texaco, Shirkey, Station Casino, and as a police dispatcher at the time she made the decision not to hire him, she responded, "I'm not—I don't know." She said that she personally saw Bradley working at Texaco; however, she admitted that she was "not sure if in all honesty if he worked at Texaco *before or after* the application." (Emphasis added). She also admitted that she was unsure whether Bradley worked at Shirkey or Station Casino *before or after* she decided not to hire him.

Bradley, however, *never* worked at Station Casino; he only attended a six-week training course there. In addition, he started working at Shirkey in June 2001, *after* Wal-Mart rejected his application. Likewise, he began working for the Richmond

-4-

Police Department as a police dispatcher in August 2001, *after* Wal-Mart rejected his application. Finally, Bradley only worked at Texaco for one day.[2]

In assessing Bradley's availability, Daugherty admitted that she conflated Bradley's July 2000 and February 2001 applications. She conceded that she "would hire him" with the availability listed on the February 2001 application. When asked why the availability listed on his February 2001 application was still a reason for not hiring him, she replied:

> Because he was currently still employed at Banta. He was full-time there. So you figure—and this is just my assumption on it. You figure he works approximately 40 hours a week there. What I was looking for was that would fit that availability, that 4:30 to 10 would be a part-time person. You add those hours on and you're talking 60 hours a week. The availability wasn't there versus this person's availability because they didn't have the full-time job. I felt like they could do it. I felt like this would be a hardship. My opinion. *Not that he indicated that*. I mean I had come to that, my own conclusion there, that that would be a hardship. *That didn't rule him out by any means*.

(Emphasis added). With regard to his July 2000 application, Daugherty testified that, at the time that Bradley submitted his February 2001 application, she "remembered looking at [the July 2000] application" in which Bradley indicated that his hours were 'negotiable' on Saturday and Sunday." She said she did not "have time to fool with somebody that's negotiable." While she never pulled Bradley's July 2000 application, she stated that she remembered it when reviewing his February 2001 application. A further concern that Daughtery had, based on the July 2000 application, was Bradley's indication that Wal-Mart could not contact his then current employer, Banta, as a

---

[2]In June 2000, Bradley spent a single day working as a cashier at Texaco. On the day he worked at Texaco, Bradley used his crutches. He voluntarily quit after his first day of work because the area in which he was working was not wheelchair accessible.

reference. Bradley, however, did not limit contact of his employer on his February 2001 application.

When asked whether there were any other reasons why she decided not to further process Bradley's application, Daugherty replied "yes" and stated:

> One [reason] was remember his—the way he responded to associates in the store as a customer, typically at the return center. Also, we had loss prevention that were suspecting. Availability from a previous application which was before this time frame, but typically when someone puts down availability, they will do whatever they can to get their foot in the door, but typically they want to stick with that availability. At the time that we were hiring, his availability was limited from 4:30 to 10. We really needed people that had open availability that were able to work anytime, not that there couldn't have been an exception because there could have been. That's probably [all the reasons]."

In a subsequent affidavit, Daugherty maintained that she was the decisionmaker who decided not to hire Bradley for a position "based on his rather specific restrictions on available work hours, work experience, and lack of work experience directly working with the general public or in retail operations."

Bradley contacted the EEOC after seeing a news report about a Missouri man who had filed a disability discrimination claim against Wal-Mart. His intent in contacting the EEOC was to offer his services as a possible witness. After speaking with counsel for the EEOC, Bradley was directed to Investigator Katz. Katz interviewed Bradley and, based upon that conversation, drafted a Charge of Discrimination. The Charge of Discrimination alleged that Wal-Mart had denied Bradley employment based on his disability. Following an investigation into Bradley's charge, the EEOC filed the instant lawsuit on Bradley's behalf.

Wal-Mart moved for summary judgment, arguing that the EEOC failed to show that Bradley was qualified for any available position, including the greeter and cashier positions. Thus, Wal-Mart attempted to show that no genuine issue of fact existed as to whether Bradley was a qualified applicant for either the people greeter position or the cashier position.

According to Wal-Mart's 2001 "People Greeter Job Description," a greeter is required to welcome and assist customers as they enter the store; provide front-end security; ensure customer safety in the greeting area; respond to electronic surveillance alarms; open doors, whenever possible, for customers when appropriate, such as mothers with small children and the disabled; offer customers a shopping cart; provide customers with directions when asked; offer assistance to customers when appropriate, such as disabled customers; ensure that the entrance has safe floor conditions for customers; and keep the front entrance clean by, for example, promptly cleaning up spills. The "physical demands" of the position require the greeter to regularly stand, occasionally lift or move objects weighing up to 10 pounds, and perform tasks involving simple grasping; however, Wal-Mart will make "reasonable accommodations" to enable disabled individuals "to perform the essential job functions."

Wal-Mart's 2001 "Cashier Job Description" states that a cashier's "primary responsibilities" are providing excellent customer service by, for example, assisting customers with the bagging and loading of their merchandise; maintaining excellent productivity levels by scanning merchandise quickly and accurately; ensuring that safe work practices are followed by using proper lifting techniques and using the "power grip" when scanning merchandise; maintaining register security; utilizing the Customer Service Manager's help if necessary; and making change, cashing checks and issuing receipts to customers. The "physical demands" of the position require the cashier to regularly stand; use his or her hands to scan items and manually key prices on the register keyboard; perform tasks involving firm grasping; have sufficient

coordination; and frequently lift or move at least 10 and up to 50 pounds. Just as with the greeter position, Wal-Mart will reasonably accommodate disabled persons so that they can perform the essential job functions. For example, the Wal-Mart Resource Retention Guide suggests that a cashier using a wheelchair is a reasonable accommodation.[3]

In support of its motion, Wal-Mart relied on the expert testimony of Dr. Chris Fevurly. Based on an independent medical examination of Bradley, Dr. Fevurly opined that Bradley was not qualified to perform the essential functions of either job. Dr. Fevurly concluded that Bradley (1) cannot carry or move objects that require two hands, as he must use one arm at all times to support his weight while standing and both arms to walk with his crutches; (2) cannot operate a "push mower," meaning that he could not operate a "push/pull" device as Kent Jayne (EEOC expert) suggested; (3) must use his crutches to climb on and off stools and takes considerable time transitioning from a sitting to a standing position; (4) falls every other week in a controlled environment using his crutches, and his chances of falling would be "daily" in a retail environment; (5) cannot perform prolonged walking and standing, as required by the positions; (6) cannot perform squatting or crawling and could only kneel for five minutes or less; (7) can only perform occasional bending and stooping; and (8) has not attempted to perform 8-hour shifts or 40-hour work weeks.

In response, the EEOC's main expert, Vocational Rehabilitation Consultant Kent Jayne, concluded that Bradley, with reasonable accommodation, could work as a cashier or greeter and would not pose a "direct threat" in either job. Because the job

---

[3]Specifically, the resource publication states:

Example: A Cashier who uses a wheelchair is unable to lift 50-pound bags of Ol'Roy dog food from the bottom of the customer's shopping cart. Since this happens infrequently, it is a reasonable accommodation for the CSM or another front-end Associate to assist with this task.

descriptions for both jobs required "some mobility and standing," Jayne recommended a sit-to-stand wheelchair, an ergonomic drafting-type stool with armrests, a scooter stool, or a lightweight wheelchair as a reasonable accommodation. For the greeter job, Jayne opined that Bradley would not need an accommodation to verify payment with a handscanner or to move shopping carts or empty trash baskets, although he might do the latter two tasks more efficiently with an electric scooter or similar device. For the cashier job, Jayne recommended, *inter alia*, a sit-to-stand wheelchair, which would enable Bradley to be upright and reach out horizontally; a drafting-type high stool with armrests for additional balance, if needed; a wheelchair narrow enough to fit into the checkstand area; removing several inches of the divider to the right of the checkstand to accommodate a regular or electric wheelchair; supplying Bradley with a handscanner to scan prices on large objects; and installing a convex mirror to enable him to spot items under shopping carts. He suggested that, if Bradley used a wheelchair or electric scooter, he "would pose no greater danger than any customer in a wheelchair or electric scooter, both of which Wal-Mart provides to customers for use in their stores." Dr. Daljeet Singh, Bradley's treating physician, also testified that Bradley was in good health and could safely do the tasks involved in the greeter and cashier positions.

Wal-Mart's expert, Dr. Fevurly, questioned whether Bradley could safely balance while seated on the drafting-type stool that did not have armrests. He acknowledged, however, that there would be a decreased risk if Bradley used a wheelchair, conceding that Bradley is "very . . . stable in a wheelchair." He also stated that he did not have a "huge problem" with Bradley using a motorized scooter or similar device, as long as he was careful. He concluded, however, that based on his observation, Bradley would "have to be up on his feet" as a cashier and, while he could sometimes use a wheelchair as a greeter, he would still have to "get up and do tasks where he is standing probably somewhere between 35 and 40 percent of the time." But, he did admit that Bradley would need to bend over and pick up items only

infrequently and that, using his wheelchair, Bradley can lift and carry heavy objects "in a nearly unlimited fashion."

A "Functional Capacity Assessment" conducted by Janet Morgan, Case Coordinator at Baptist-Lutheran Medical Center, revealed that Bradley was capable of "slow to moderate pace ambulation and stair climbing using canes" and "able to transition from sitting in a wheelchair to standing with crutch support safely over two days of testing" to "work overhead from a seat position, to kneel unsupported, and to perform modified materials handling activities while seated in a wheelchair." Morgan noted that Bradley demonstrated "improved function when allowed to modify activities to include wheelchair for mobility." Based on her assessment, she concluded that, without accommodation, Bradley could not perform the essential functions of the greeter and cashier positions. She indicated, however, that her conclusions "do not include consideration of possible task modifications or reasonable accommodation. Examples might include use of wheelchair for mobility or limited materials handling."

The district court granted Wal-Mart's motion for summary judgment, finding that the EEOC failed to establish that Bradley was qualified to perform the essential functions of the greeter and cashier positions. The EEOC then moved for reconsideration, and the district court denied the motion, adding that summary judgment was also appropriate because the EEOC failed to present evidence that Wal-Mart's reasons for not hiring Bradley were pretextual.

II. *Discussion*

On appeal, the EEOC argues that the district court erred in finding that insufficient evidence existed to establish (1) that Bradley is "qualified" for the greeter and cashier positions and (2) that Wal-Mart's stated reasons for not hiring Bradley are pretextual.

-10-

In response, Wal-Mart asserts that the district court correctly granted summary judgment in its favor and also asserts an additional ground that the EEOC has failed to rebut Wal-Mart's evidence that Bradley would pose a "direct harm" to himself and others if he worked as a greeter or a cashier.

We review de novo the district court's grant of summary judgment to Wal-Mart. *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 342 (8th Cir. 2006). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quotations and citation omitted).

### A. *Qualified To Perform Essential Functions*

Where no direct evidence of discrimination exists, we evaluate ADA claims by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Didier v. Schwan Food Co.*, 465 F.3d 838, 841 (8th Cir. 2006). Under this framework, the plaintiff must first establish a prima facie case of discrimination: "that he has an ADA-qualifying disability; that he is qualified to perform the essential functions of his position, with or without a reasonable accommodation; and [that] he suffered an adverse action due to his disability." *Id.*

In the present case, neither party disputes that the first and third elements of the prima facie case have been established; therefore, the decisive issue is whether Bradley is "qualified" to perform the essential functions of the position, with or without reasonable accommodation.

"The determination of whether an individual is qualified for purposes of the ADA is a two-step process, and should be made as of the time of the employment decision." *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1047 (8th Cir. 1999). First, we consider whether "the individual possesses the requisite skills, education, certification or experience necessary for the job." *Id.* Second, we consider "whether

the individual can, despite [his] impairments, perform the essential functions of the job either with or without reasonable accommodation." *Id*.

Under the second inquiry, "[a]n essential function 'means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position.'" *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir. 1998) (quoting 29 C.F.R. § 1630.2(n)(1)). While the plaintiff bears the burden of ultimately proving that he is "qualified," "an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions." *Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 680 (8th Cir. 2001). The following evidence may be used to establish an "essential function" of a job:

> (1) "[t]he employer's judgment as to which functions are essential"; (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the amount of time spent on the job performing the function"; (4) "the consequences of not requiring the incumbent to perform the function"; and (5) "the current work experience of incumbents in similar jobs."

*Moritz*, 147 F.3d at 787 (quoting 29 C.F.R. § 1630.2(n)(3)).

"[I]f the employee cannot perform the essential functions of the job *without* an accommodation, he must only make a 'facial showing that a reasonable accommodation[4] is *possible*. . . .'" *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d

_____

[4]"Reasonable accommodation" includes:

 (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

 (B) job restructuring, part-time or modified work schedules,

707, 712 (8th Cir. 2003) (alterations and emphasis in original) (quoting *Benson v. N.W. Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995)). "[O]nce the plaintiff makes a facial showing that reasonable accommodation is possible, the burden of *production* shifts to the employer to show that it is unable to accommodate the employee." *Benson*, 62 F.3d at 1112 (emphasis in original) (internal quotations and citation omitted). If the employer demonstrates that the plaintiff is unable to perform the "essential functions of the job even with reasonable accommodation," the plaintiff must then rebut that showing "with evidence of his individual capabilities." *Id*. Thus, the plaintiff's burden "merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination." *Id*.

Applying the two-step analysis, we hold that the EEOC presented sufficient evidence that Bradley is "qualified" for the positions of greeter and cashier. First, Bradley meets the skill, education, and experience requirements for the positions of cashier and greeter. The job descriptions for both greeter and cashier state that "no experience or qualification is required."

Second, the EEOC has made a "facial showing" that a reasonable accommodation would enable Bradley to perform the essential functions of both the greeter and cashier positions. Jayne, the EEOC's main expert, proposed specific accommodations that would enable Bradley to have the requisite mobility and standing required for both jobs. For the cashier position, Jayne suggested several accommodations, including a sit-to-stand wheelchair, a drafting-type high stool with

---

reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

-13-

armrests for additional balance, a narrow wheelchair, the removal of several inches of the divider beside the checkstand to accommodate a regular wheelchair, supplying Bradley with a handscanner, and installing a convex mirror. For the greeter position, Jayne recommended that Bradley use an electronic scooter or similar device.

Wal-Mart attacks the *method* by which Jayne proposed these accommodations, pointing out that Jayne never observed Bradley use these devices or perform the duties that would be required of him as a greeter or cashier. However, Wal-Mart's argument does not defeat the EEOC's "facial showing" that Wal-Mart could accommodate Bradley's disability. Additionally, Wal-Mart's own expert, Dr. Fevurly, conceded that Bradley was "very . . . stable in a wheelchair." Wal-Mart's own Resource Retention Guide suggests accommodations that might assist employees with mobility limitations, with one illustration specifically involving a "cashier who uses a wheelchair."

Wal-Mart has also failed to show that it is unable to accommodate Bradley. The majority of Dr. Fevurly's assessment of Bradley's capabilities focuses on Bradley's limitations when using his *crutches*, not a wheelchair. Wal-Mart has offered no evidence that Bradley cannot perform the essential functions of the greeter and cashier positions with reasonable accommodation; instead, it attacks the credibility of Jayne's testimony. Such a credibility determination is best reserved for juries.

Therefore, we hold that the EEOC sufficiently established a prima facie case of discrimination.

## B. *Pretext for Discrimination*

Once the plaintiff establishes a prima-facie case of discrimination, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse employment action. *Didier*, 465 F.3d at 841. If the employer offers a

legitimate, nondiscriminatory reason for its actions, then the burden shifts back to the plaintiff to show that the stated reason is a pretext for discrimination. *Id.*

A plaintiff may prove pretext by showing that the employer's stated reason for the adverse employment action has no basis in fact. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). "[I]mplausible explanations and false or shifting reasons support a finding of illegal motivation." *Hall v. Nat'l Labor Relations Bd.*, 941 F.2d 684, 688 (8th Cir. 1991). Because the employer's "motive and intent are at the heart of a discrimination case," the central inquiry "is whether [disability] was a factor in the employment decision *at the moment it was made.*" *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 403 (1st Cir. 1990) (emphasis in original) (internal quotations and citation omitted).

An employer is prohibited from inventing a "*post hoc* rationalization for its actions at the rebuttal stage of the case." *Id.* at 404 (citing *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir.1990) (holding that where a white applicant did not apply for position until after decision makers had determined a black employee was not qualified, relative qualifications would not establish a non-discriminatory reason); *Hill v. Seaboard C.L.R. Co.,* 767 F.2d 771, 774 (11th Cir.1985) ("Of course, failure to promote a plaintiff because the person actually promoted was more qualified is a non-discriminatory reason, but the articulation of that reason must include the fact that the decision-maker knew that the promoted individual's qualifications were superior at the time the decision was made.")). Therefore, unless the employer articulates a legitimate, nondiscriminatory reason for not hiring the plaintiff that "*actually* motivated the decision, the reason is legally insufficient." *Id.* (emphasis in original).

Here, Wal-Mart has advanced several reasons for not hiring Bradley, mainly focusing on his job history and limited availability. Thus, the EEOC bears the burden of demonstrating that these reasons are pretextual. We hold that the EEOC has

satisfied this burden, as sufficient evidence exists that the reasons Wal-Mart offered did not actually motivate the decision not to hire Bradley.

First, as to Bradley's job history, Daugherty conceded that she did not know and was "not sure" if Bradley worked at Texaco, Shirkey, and Station Casino *before or after* she decided not to hire him. Additionally, while Daugherty testified that she was personally aware of "short-term" jobs that Bradley failed to list on his application, including Shirkey and the Richmond Police Department, Bradley did not work at the nursing home or for the police department until *after* Wal-Mart rejected his application. The EEOC also produced evidence that Bradley *never* worked at Station Casino, as Daugherty suggested. The jury could also question Daugherty's statement that she observed Bradley working at Texaco, considering he only worked there for one day. And, while Daugherty testified that she was concerned about Bradley's statement that he did not want Wal-Mart to contact Banta, his current employer, this statement only appeared in his July 2000 application, not his February 2001 application. Therefore, a reasonable jury could find, based on Daugherty's testimony, that not hiring Bradley based on his job history has no basis in fact and was instead a post-hoc rationalization.

Second, a reasonable jury could conclude that Bradley's lack of availability did not actually motivate Wal-Mart's decision. Daugherty admitted that she considered both Bradley's July 2000 and February 2001 applications in determining whether to hire him. Specifically, she stated that she remembered Bradley indicating that his hours were "negotiable" on the weekends. Wal-Mart has produced no evidence, however, that it routinely refers back to previous applications when an applicant applies for a second time. Additionally, the jury could question whether Daugherty actually "remembered" the details of Bradley's July 2000 application when reviewing his February 2001 application. Furthermore, Daugherty conceded that she would hire Bradley based on the availability he listed on his February 2001 application alone.

-16-

Because the EEOC provided sufficient evidence that Wal-Mart's stated reasons for not hiring Bradley were pretextual, we hold that the district court erred in granting summary judgment to Wal-Mart on the EEOC's discrimination claim.

### C. *Direct Threat*

Wal-Mart argues that the "direct threat" affirmative defense provides this court with an alternative basis for upholding the district court's grant of summary judgment in its favor.

"[S]ummary judgment would still be appropriate under the ADA if [Bradley] posed 'a direct threat to the health or safety of other individuals in the workplace.'" *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (quoting 42 U.S.C. § 12113(b)). A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see also* 29 C.F.R. § 1630.2(r).

The Supreme Court requires an individualized direct threat analysis that relies on the "best current medical or other objective evidence" in order to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Nunes*, 164 F.3d at 1248 (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998); *Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273 (1987)). "Specific factors to be considered include (1) the duration of risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm." *Id.*

Although we have previously declined to resolve which party bears the burden of proving direct threat, *Stafne v. Unicare Homes*, 266 F.3d 771, 775 (8th Cir. 2001), we now hold that the employer bears the burden of proof, as the direct threat defense is an affirmative defense. *See Nunes*, 164 F.3d at 1247; *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 220 (2d Cir. 2001) ("The legislative history of the

-17-

ADA also supports the premise that '[t]he plaintiff is not required to prove that he or she poses no risk.'"); *Dadian v. Village of Wilmette*, 269 F.3d 831, 840–41 (7th Cir. 2001) ("[W]e conclude that a public entity that asserts the reason it failed to accommodate a disabled individual was because she posed a direct threat to safety bears the burden of proof on that defense at trial."). In other contexts, we have held that the defendant bears the burden of proving an affirmative defense. *See, e.g.*, *Jankovitz v. Des Moines Indep. Cmty. Sch. Dist.*, 421 F.3d 649, 654 (8th Cir. 2005) ("Defendant bears the burden of proving its statutory affirmative defense."); *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005) ("This circuit considers the PLRA's exhaustion requirement to be an affirmative defense that the defendant has the burden to plead and to prove."); *Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 714 (8th Cir. 2004) ("The specificity requirement of Rule 56 applies with equal force where the defendant resists summary judgment, especially where the defendant resists by asserting affirmative defenses which it has a burden to prove.").

In the present case, Wal-Mart's expert, Dr. Fevurly, opined that Bradley would pose many safety risks if he was hired as a greeter or cashier. Specifically, Dr. Fevurly testified that the "biggest risk is the fact that [Bradley's] legs are not capable of holding him without arm support," as Bradley admitted that he frequently falls on floors that have impediments. Second, Dr. Fevurly pointed out that Bradley is "very wide when he uses his crutches . . . twice the width of a normal person depending on the area where he is," meaning that Bradley could pose an "obstacle" to people coming in and out of the store. Finally, Dr. Fevurly stated that standing for an entire shift would "place [Bradley] at great risk" for "recurrent back and knee pain" that would "make it difficult to tolerate these tasks" over time.

Dr. Fevurly admitted, however, that his opinion assumes that Bradley would be using crutches, not a wheelchair. Wal-Mart has failed to present evidence that a reasonable accommodation—such as a wheelchair—would not eliminate the risks identified by Dr. Fevurly. In fact, Dr. Fevurly admitted that Bradley was "very . . .

stable in a wheelchair" and that Bradley would be "much less of a threat to himself and to coworkers" when he is not on crutches. Furthermore, Wal-Mart has failed to explain how Bradley, using a wheelchair or other similar device, poses any more of a threat than Wal-Mart customers who shop using such devices.

Therefore, we hold that Wal-Mart has failed to prove that Bradley, using a wheelchair or other reasonable accommodation, would pose a direct threat to the safety of himself or others.

### III. *Conclusion*

Accordingly, we reverse the district court's grant of summary judgment to Wal-Mart and remand for a trial on the merits.

_____