NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12136


SEAN GANNON  vs.  CITY OF BOSTON.


Suffolk.     December 8, 2016. - April 18, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, & Budd, JJ.[1]


Anti-Discrimination Law, Handicap, Employment, Burden of proof.
     Employment, Discrimination.  Handicapped Persons.
     Municipal Corporations, Police.  Public Employment, Police.
     Practice, Civil, Summary judgment, Burden of proof.



     Civil action commenced in the Superior Court Department on September 27, 2012.

     The case was heard by Douglas H. Wilkins, J., on a motion for summary judgment, and a motion for reconsideration was considered by him.


     Harold L. Lichten (Adelaide H. Pagano also present) for the plaintiff.
     Nicole I. Taub, Senior Special Assistant Corporation Counsel, for the defendant.
     Simone R. Liebman & Constance M. McGrane, for the Massachusetts Commission Against Discrimination, amicus curiae, submitted a brief.
     Robert S. Mantell, for Massachusetts Employment Lawyers Association, amicus curiae, submitted a brief.

-----

[1] Justice Botsford participated in the deliberation on this case prior to her retirement.

GANTS, C.J.  The issue presented on appeal is whether a city is entitled to summary judgment on a handicap discrimination claim under G. L. c. 151B, § 4 (16), where the police department limits an officer to desk duty based on an informed, good faith belief that the officer can no longer safely patrol the streets because of his perceived handicap.  We conclude that summary judgment is not appropriate where there are facts in dispute as to whether the officer is a qualified handicapped person capable of performing the full duties of a patrol officer without posing an unacceptably significant risk of serious injury to himself or others.  The city at trial may present the evidence that caused the department to believe that the officer cannot safely assume the full duties of a police officer, but that determination rests with the fact finder based on the preponderance of the evidence, not with the department based on its informed, good faith belief.  Therefore, we vacate the motion judge's entry of summary judgment in favor of the city of Boston (city) and remand the case for a trial.[2]

Background.  The plaintiff, Sean Gannon (Gannon or plaintiff), began working for the Boston police department (department) in 1996.  For the first decade of his employment, Gannon was a patrol officer performing the full range of patrol

---

[2] We acknowledge the amicus briefs submitted by the Massachusetts Commission Against Discrimination and the Massachusetts Employment Lawyers Association.

officer duties.  Gannon is an avid practitioner of mixed martial arts (MMA) who has trained since his teenage years in techniques including taekwondo, judo and aikido, Brazilian jujitsu, and Filipino stick and knife fighting.  He began fighting in MMA amateur bouts at night clubs on the South Shore in 2002, before making his professional debut in August, 2004.

Gannon suffered repeated head injuries in his professional fights.  In his first fight, Gannon received a roundhouse kick to his head and afterwards began vomiting and did not feel well. An ambulance transported him to a hospital, where he was diagnosed with a concussion.  Gannon's next fight came two months later, in October, 2004, when he faced off with a widely reputed fighter known by the moniker "Kimbo Slice."  Gannon and that opponent agreed to a bare-knuckle boxing match governed by the traditional London Prize Rules, which permit a fight to continue until a fighter is knocked down and cannot return to his feet in thirty seconds.  Gannon won the fight by knockout, but afterwards he spent several days in the hospital and was diagnosed with another concussion.  Gannon's final professional fight came on October 7, 2005, where he lost by a technical knockout, and broke his right eye socket.  He did not return to work until October 14, 2005, and was then placed on restricted duty, limited to "inside only" work, and barred from paid details.  The restrictions were lifted on October 20, 2005.

In December, 2005, Gannon was diagnosed with obstructive sleep apnea and insomnia.  He was treated for these conditions with various medications and procedures.  On February 1, 2006, Gannon did not appear for his scheduled shift of police duty, and officers went to his home to check on him.  They found him in an incoherent and confused state.  Gannon explained that he had overslept as a result of the treatment he was undergoing for sleep apnea.  After this incident, the department placed him on administrative duty, pending a fitness evaluation by the department's psychiatrist, Dr. Marcia Scott.

Based on her initial evaluation, Dr. Scott described Gannon as "physically very restless" and opined that "[h]is restlessness could be associated with brain injury from his sport."  Accordingly, Dr. Scott ordered additional neuropsychological testing with Dr. Lucinda Doran, who administered tests to assess Gannon's intellectual abilities. She concluded that, while Gannon appeared to possess "solid overall capabilities," his "inability to process information quickly clearly reduce[d] his mental efficiency and his ability to react and respond appropriately."  Around the same time, Dr. Scott reported from her ongoing interactions with Gannon that his thinking was impaired, "he ha[d] difficulty focusing, his speech [was] pressured and garbled, his face red and twisted." Later in 2006, Dr. Scott noted that Gannon remained "on modified

duty due to significant mental impairments and reduction in mental performance . . . [a]lthough there [had] been some improvement over the intervening months."  She continued to recommend against Gannon's return to full-duty status, explaining in a follow-up report in October, 2008, "Mr. Gannon has serious mental deficits that interfere with his ability to do the essential functions of an armed police officer."

Gannon sought treatment from his own doctors, including Dr. Aaron Nelson, a neuropsychologist, and Dr. Tuesday Burns, a psychiatrist.  In a 2006 evaluation, Dr. Nelson's testing revealed "baseline verbal intellectual ability in the superior range and highly variable performance on measures of attention and executive function, suggestive of frontal systems compromise."  Dr. Nelson opined that Gannon's issues "likely related to his history of multiple concussive injuries" and that Gannon's anxiety problems were exacerbating his difficulties. Two years later, however, Dr. Nelson tested Gannon for a second time and reported "stronger performance on a wide range of test measures."  Dr. Burns, who had been treating Gannon for anxiety and attentional difficulties, subsequently informed the department that Gannon had "improved significantly across all areas" and that there were no "psychiatric or neurologic contraindications to Mr. Gannon being re-instated to full duty at the Boston Police Department."

Dr. Scott, the department's psychiatrist, disagreed with Dr. Burns's assessment. "Mr. Gannon has a serious chronic mental disorder as well as a history of repeated head trauma," she wrote in January, 2009. "These impairments interfere with his ability to accurately assess situations, communicate accurately, make accurate judgments, solve problems and manage the stresses involved in the job of an armed police officer."

In 2010, the department retained neuropsychologist Dr. Muriel Lezak to review Gannon's testing records. Dr. Lezak evaluated the prior testing results against metanorms developed from twenty-eight studies. She reported that Gannon's response or reaction times fell below the fifth percentile for persons his age, in the borderline-defective to defective range. "[W]hat he appears to be unable to do, when thought or concentration is required, is maintain accuracy and respond at a normal rate of speed," Dr. Lezak wrote. Dr. Lezak later tested Gannon herself. Her new results supported her earlier evaluation, and led her to conclude, "[I]t is unlikely that an intensive remediation program could improve [Gannon's] response speed to near normal levels or enable him to develop consistent memory recall, both to a level that would allow him to perform . . . police functions requiring response speed and reliable memory recall."

In March, 2011, the department filed an application with the Public Employee Retirement Administration Commission (PERAC) to involuntarily retire Gannon. PERAC rejected the application after three physicians performed independent evaluations of Gannon and all concluded that he was capable of performing the essential functions of his job as a police officer. Gannon remained (and continues to remain) on desk duty, where he serves as the booking officer and works at the front desk of the East Boston police station. Gannon is not currently permitted to carry a service weapon, which prevents him from obtaining detail work and certain overtime opportunities.

In September, 2009, the Boston Patrolmen's Association filed a grievance on Gannon's behalf demanding that he be permitted to resume the full duties of a patrol officer. In advance of the arbitration proceeding, Gannon solicited an assessment from an additional neuropsychologist, Dr. Neal McGrath. Dr. McGrath concluded that Gannon was fit to return to full patrol duty, stating that "any cognitive deficits that Officer Gannon may have demonstrated in past evaluations ha[d] cleared and were therefore more likely related to treatable medical conditions such as sleep disorder or mood disorder." But Dr. McGrath changed his opinion after reviewing Dr. Lezak's testing, recommending "further confirmation of . . . Gannon's ability to respond to emergency decisions as a police officer

under conditions more closely resembling actual emergencies." Consequently, the union hired a police consultant, who performed live simulation testing on Gannon. This testing included a "Shoot/Don't Shoot" target drill, and other role-playing scenarios. Gannon performed well, and Dr. McGrath reaffirmed his position that Gannon was "fit for full duty as a Boston [p]olice officer." Dr. Lezak stood by her opinion and rejected Dr. McGrath's reliance on the simulations, saying that "no matter how real you try to make [them]," the simulations were not sufficient. She added, "[Gannon] is not responding while running, he's not responding while he is sensing danger for himself, he's not responding while there's a whole bunch of stuff going on, sirens, and other cars pulling up. This is where my concern is." In May, 2014, the arbitrator found that the union had not "undercut the force of Dr. Lezak's medical opinion," and concluded that the department did not act unreasonably in placing Gannon on administrative duty because of his "neuropsychological problem of speed and accuracy."

In 2012, Gannon brought a complaint with the Massachusetts Commission Against Discrimination (MCAD), alleging that the city acted in violation of G. L. c. 151B, § 4 (16), by refusing to return him to full duty. After the requisite ninety days, he filed a discrimination lawsuit against the city in Superior Court. The city moved for summary judgment in August, 2015,

arguing that Gannon did not meet the statutory definition of a handicapped person; that he could not perform the essential functions of a full-duty police officer; that he had not suffered any adverse action; and that, even if he had, the adverse action was taken for a legitimate, nondiscriminatory reason.  In ruling on the city's motion, the judge, viewing the evidence in the light most favorable to Gannon, determined that Gannon had met his burden of showing a prima facie case of handicap discrimination.  He found that "the evidence . . . obviously supports a fact-finder in concluding . . . that the [c]ity regards Gannon as having physical impairments . . . that curtail[] a 'major' life activity, including brain functions such as memory, ability to recall and follow directions, and []ability to make split second decisions," thus satisfying the requirement that Gannon prove he has a "handicap" within the meaning of G. L. c. 151B, § 1 (17).  The judge also noted, "The evidence could hardly be more in conflict on the facts bearing on the medical aspects" of the case.  He concluded that, because he cannot resolve factual disputes in a motion for summary judgment, he must accept as true the reports, testimony, and affidavits from Gannon's doctors and other experts that state that Gannon can perform the essential duties of a full-duty Boston police officer.  The judge also assumed for purposes of the motion that the city had taken an adverse employment action

against Gannon by assigning him to desk duty rather than full duty.

After he concluded that Gannon had made the required prima facie showing of discrimination, the judge found that "[t]he city [had] met its burden to articulate a non-discriminatory reason for its assignment of Gannon to desk duty, namely its concern that Gannon's loss of cognitive function and memory impairs his ability to do essential tasks, such as responding in an emergency and exercising the necessary judgment in high stress situations, including those involving the use of firearms."

The judge then determined that, even viewing the evidence in the light most favorable to Gannon, he had failed to sustain his burden of proving "that the [c]ity's articulated reason is a pretext for discrimination."  The judge framed the question of pretext as "whether the medical and psychological evidence is so thin that a reasonable jury may conclude that the [c]ity could not honestly have concerns about Gannon's abilities in critical areas, including reactions and decisions during crisis, possibly involving firearms."  Finding that "[t]he answer, compelled by the record, is 'no,'" the judge allowed the city's motion for summary judgment.

The plaintiff moved for reconsideration, claiming that "it is illegal disability discrimination for the [c]ity to place

Gannon on desk duty because of his perceived handicap if he is in fact capable of performing the essential functions of a police officer." The judge denied the motion, declaring that "the question of whether the plaintiff was in fact a qualified handicapped individual is distinct from whether the [c]ity discriminated because of his perceived handicap." The judge found that, where the city had concluded, "with ample expert support," that Gannon could not perform the duties of a patrol officer, "[t]he stated reason for its action was non-discriminatory -- the plaintiff's inability to do the job. It did not matter why the plaintiff lacked that ability."

Gannon filed a notice of appeal, and we allowed his application for direct appellate review.

Discussion. Under G. L. c. 151B, § 4 (16), it is an "unlawful practice . . . [f]or any employer . . . to . . . refuse to . . . advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the

employer's business."[3]  In interpreting the meaning of these provisions, we give "substantial deference" to the guidelines interpreting G. L. c. 151B promulgated by the MCAD, although we recognize that the guidelines do not carry the force of law. Dahill v. Police Dep't of Boston, 434 Mass. 233, 239 (2001), citing Massachusetts Commission Against Discrimination, Guidelines:  Employment Discrimination on the Basis of Handicap Chapter 151B § II.A.7 (1998) (MCAD Guidelines).  We remain mindful that the Legislature instructed that G. L. c. 151B "shall be construed liberally for the accomplishment of its purposes."  G. L. c. 151B, § 9.[4]

There are two general categories of handicap discrimination cases, which differ according to the explanation given for the adverse employment action by the employer.  In the first, the employer denies that the employment action was motivated by the plaintiff employee's handicap, and contends that the action was

---

[3] The law defines the term "handicap" to mean "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment."  G. L. c. 151B, § 1 (17).  "[H]andicapped person" means any person who has a handicap.  G. L. c. 151B, § 1 (19).

[4] Because the language of G. L. c. 151B resembles language used in Federal statutes prohibiting discrimination, we also look to Federal case law for guidance in our interpretations of the scope of our antidiscrimination law.  See, e.g., Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 451 n.6 (2002); Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 384 (1993); Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 137-138 (1976).

based on other conduct by the employee, such as insubordination, poor job performance, or chronic tardiness, or resulted from a reduction in force, that is unrelated to the plaintiff's handicap.  See Tate v. Department of Mental Health, 419 Mass 356, 361 (1995).  In these cases, we follow the framework, patterned on that set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), in which the plaintiff employee bears the burden of making a prima facie showing of handicap discrimination by offering evidence that (1) the employee is a "handicapped person" because he or she has "a physical or mental impairment which substantially limits one or more major life activities" (or a record thereof) or because the employee is "regarded [by his or her employer] as having such an impairment," G. L. c. 151B, § 1 (17), (19) (defining "handicap" and "handicapped person"); (2) he or she is a "qualified handicapped person" who "is capable of performing the essential functions of a particular job, or who would be capable of" doing so with reasonable accommodation, G. L. c. 151B, § 1 (16) (defining "qualified handicapped person"); (3) he or she was terminated or otherwise subject to an adverse action by his or her employer; and (4) where, as here, the adverse action is prohibiting the plaintiff from assuming the duties of a position, the position otherwise remained open to him or her.[5]

_____

    [5] Where the adverse action is termination of the plaintiff

See MCAD Guidelines, supra at § IX.A.2.[6] Where the plaintiff employee makes this prima facie showing, the burden shifts to the employer to show with credible evidence that the real reason for the adverse employment action was not the employee's handicap but a lawful reason that was unrelated to the employee's handicap. See id. See also Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000); Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441-442 (1995). Where the employer meets this burden, the burden shifts back to the plaintiff employee to prove that the adverse action was taken "because of his [or her] handicap," G. L. c. 151B, § 4 (16), and not for the reason proffered by the employer. See MCAD Guidelines, supra. See also Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 681 (2016); Abramian, 432 Mass. at 117; Blare, 419 Mass. at 442-443. This type of case is often labeled a "pretext case" because the plaintiff employee may defeat an employer's motion for summary judgment by showing that

---

employee, the fourth element requires the employee to show that "the position he [or she] had occupied remained open and the employer sought to fill it." See Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1, 3 (1998); Beal v. Selectmen of Hingham, 419 Mass. 535, 541 (1995).

[6] This standard reflects our recognition that proof of an employer's true motive can be elusive. See Wheelock College, 371 Mass. at 137-138. We have noted in reference to the final element that the necessary showing may vary depending on the specific circumstances of each case. See Beal, 419 Mass. at 541.

there are disputed issues of fact as to whether the employer's proffered reason was not the true reason, which permit the inference that the employer offered a pretextual reason because the true reason was discrimination on the basis of handicap. See Bulwer, supra at 681-682; Blare, supra at 444-445.[7] Virtually all cases alleging discrimination on the basis of race, gender, and national origin fall into this first category, because an employer will rarely concede that the employer's true motivation for the employment action was the employee's race, gender, or national origin.

In the second category of handicap discrimination cases, the employer admits that the adverse action was taken because of the plaintiff employee's handicap but contends that the employee is not protected under the statute because the employee was not capable of performing the essential functions of the job even with reasonable accommodation, and therefore is not a qualified handicapped person. In this type of case, the plaintiff

---

[7] Although a showing of pretext permits a finding of discriminatory intent at trial, it does not require such a finding. "The employer may counter the effect of this evidence by showing that, even if his articulated reason for the adverse action is untrue, he had no discriminatory intent, or that his action was based on a different, nondiscriminatory reason." Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 118 (2000). See Lipchitz v. Raytheon Co., 434 Mass. 493, 508 (2001) (burden-shifting rules and pretext inquiry involve questions of law more appropriately left to trial judge; jury instructions should focus on ultimate issues of harm, discriminatory animus, and causation).

employee's burden to make a prima facie showing is straightforward:  the plaintiff employee must show that he or she suffered an adverse employment action, that he or she has a "handicap," as defined in G. L. c. 151B, § 1, that he or she is a "qualified handicapped person," as defined in § 1, and that the adverse action was taken because of his or her handicap. See Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 450 (2002).  Accord Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 32-33 (1st Cir. 2000).  The plaintiff employee need not prove that the employer's stated reason was not the true reason for the adverse action, but instead must prove that he or she indeed was capable of performing the essential functions of the job and therefore was a qualified handicapped person.  See Russell, supra; Ward, supra. Accordingly, this type of case is best described as a qualified handicapped person case, because the crux of the case is not whether the employer's explanation was a pretext but whether the plaintiff employee was a qualified handicapped person.[8]

_____

[8] We have at times referred to pretext cases as "indirect evidence" cases, and qualified handicapped person cases as "direct evidence" cases.  See Lipchitz, 434 Mass. at 501; Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 664-665 (2000).  We find this focus on the nature of the evidence unhelpful and a potential source of confusion in distinguishing these cases.  In a pretext case, where the plaintiff employee must generally rely on circumstantial evidence, the plaintiff may still offer in evidence specific statements by supervisors reflecting discriminatory animus

The judge erred in analyzing the evidence in this case as if it were a pretext case when it should have been analyzed as a qualified handicapped person case. Where, as here, the city has limited the duties of a police officer because it considers him or her incapable of performing the essential duties of a patrol officer as a result of physical or mental limitations arising from the officer's handicap, the adverse employment action is "because of his [or her] handicap." G. L. c. 151B, § 4 (16). See MCAD Guidelines, supra at IX.A; Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821-822 (1997). See also Ward, 209 F.3d at 37-38. It does not become a pretext case simply because the department contends that the adverse employment action was motivated solely by those physical or mental limitations, and not by the handicap, where those limitations arise from the handicap. See Rizzo v. Children's World Learning Ctrs., Inc., 84 F.3d 758, 762-763 (5th Cir. 1996) (judge erred by applying pretext analysis to school's claim that it demoted hearing-

_____

(which the employer will seek to characterize as "stray comments") that might be described as direct evidence. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 684-687 (2016) (discussing five different kinds of evidence jury might have relied on in determining employer's real reasons for termination). See also Johansen v. NCR Comten, Inc., 30 Mass. App. Ct. 294, 302 (1991). Similarly, in a qualified handicapped person case, there may be so-called indirect evidence that the employer's belief that the employee is incapable of performing the essential duties of the job is based on stereotypes and assumptions rather than hard facts. See Labonte v. Hutchins & Wheeler, 424 Mass. 813, 815 (1997).

impaired bus driver out of fear that she would not be able to hear if student in her bus was choking; relevant question was whether plaintiff actually presented safety threat). For instance, where a police department terminates an officer's employment because of his or her failing eyesight, it cannot defeat a discrimination claim by arguing that it did not fire the officer because of the handicap but because he or she could not see clearly enough to perform the position's essential duties.

This analytical flaw transformed the plaintiff's burden on summary judgment in this case. By mischaracterizing this as a pretext case, the judge determined that Gannon could not prevail on his claim of handicap discrimination because he had failed to rebut the department's contention that the real reason for its refusal to return him to full duty was that it "honestly" had concerns about Gannon's reaction time and his decision-making during crisis. But where these concerns arose from Gannon's handicap, this analysis essentially meant that the department prevailed because Gannon failed to present evidence to show that the department did not act in good faith in concluding that Gannon could not perform the essential duties of his job. In a qualified handicapped person case, however, the employer does not prevail simply because it indisputably acted in good faith; it can prevail only if the handicapped employee fails to prove

by a preponderance of the evidence that he or she was able to perform the essential duties of the position with reasonable accommodation.  See Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1, 3 (1998).  See also Pushkin v. Regents of the Univ. of Colo., 658 F.2d 1372, 1385 (10th Cir. 1981) ("It would be a rare case indeed in which a hostile discriminatory purpose or subjective intent to discriminate solely on the basis of handicap could be shown.  Discrimination on the basis of handicap usually results from more invidious causative elements and often occurs under the guise of extending a helping hand or a mistaken, restrictive belief as to the limitations of handicapped persons").

As to the issue whether Gannon was capable of performing the essential duties of a patrol officer, the judge recognized that there was a genuine dispute of material fact, and that Gannon had offered substantial evidence from medical and police experts indicating that he can perform the essential, full duties of a Boston police officer.  Because there remains a factual dispute as to whether Gannon can capably perform the essential duties of a full-duty police officer, the department's motion for summary judgment should have been denied.  At trial, the fact finder must determine, not whether the department acted on a good faith belief that Gannon cannot capably perform these duties because of his handicap, but whether Gannon has proved by

a preponderance of the evidence that he can do so. See Labonte, 424 Mass. at 822-823. See also Gates v. Flood, 57 Mass. App. Ct. 739, 745 (2003) (it is no defense that employer mistakenly judged employee's qualification). Cf. Bragdon v. Abbott, 524 U.S. 624, 628-629, 649 (1998) (where patient infected with human immunodeficiency virus alleged that dentist discriminated against her in violation of Americans with Disabilities Act, 42 U.S.C. § 12182[a], by refusing to fill her cavities in his dental office because he feared for his safety, "[h]is belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability"). The department may offer in evidence all of the tests and expert opinions that caused it to conclude that Gannon cannot perform the essential duties of a patrol officer, but our law of handicapped discrimination grants this determination to the fact finder based on the preponderance of the evidence, not to the employer based on its good faith belief. See Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 383 (1993).

In order to rebut Gannon's prima facie case, the city bears the burden of specifying which essential duty or duties Gannon is incapable of performing because of his handicap. See, e.g., Carleton v. Commonwealth, 447 Mass. 791, 810 (2006). The department appears to contend that it is an essential duty of a patrol officer to respond to stressful situations and

emergencies with reasonable judgment and speed, and that Gannon is not capable of performing these duties because of his cognitive limitations and slow reaction time.  Implicit in this contention is that, if Gannon were allowed to become a patrol officer, he would put the safety of the public, his fellow officers, and himself at risk.

Where an employer defends a decision to terminate or not hire a handicapped individual (or, as here, to not allow the individual to resume being a full-duty patrol officer) because "there is a risk of future injury to the employee or others," the MCAD Guidelines deem this an affirmative defense for which the employer bears the burden of proving "that there is a 'reasonable probability of substantial harm' to the employee or others."  MCAD Guidelines, supra at IX.B.3, quoting Ryan v. Lunenberg, 11 M.D.L.R. 1215, 1241-1242 (1989).  Placing this burden of proof on the employer is improper for two reasons.

First, it is contrary to our case law holding that the burden of proving unlawful discrimination remains with the plaintiff "at all times."  See Abramian, 432 Mass. at 118, quoting Wheelock College v. Massachusetts Comm'n Against Discrimination, 370 Mass. 130, 139 (1976).  See also Cox, 414 Mass. at 386 (plaintiff had burden to "persuade the judge that

he was capable of climbing poles safely" or prove that climbing

was not essential function of position).[9]

Second, where, as with a patrol officer, the nature of the

job will at times place the employee in harm's way, it is

impossible to divorce the question whether the employee is

capable of performing the essential functions of the position

from the question whether the employee can perform those

functions safely.[10]  General Laws c. 151B, § 1, defines various

---

[9] The defendant employer bears the burden of proof only where it claims that the reasonable accommodation that might enable the employee capably to perform the essential functions of the position would impose an undue hardship on the conduct of the employer's business.  See Godfrey v. Globe Newspaper Co., 457 Mass. 113, 120 (2010) ("Once an employee 'make[s] at least a facial showing that reasonable accommodation is possible,' the burden of proof [of both production and persuasion] shifts to the employer to establish that a suggested accommodation would impose an undue hardship" [citations omitted]).  See also Massachusetts Commission Against Discrimination, Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B § II.D (1998).  The employer's burden as to this issue is imposed by the plain meaning of the language of G. L. c. 151B, § 4 (16), which prohibits discrimination against qualified handicapped individuals "unless the employer can demonstrate that the accommodation required to be made . . . would impose an undue hardship to the employer's business."

[10] Surveying the Federal decisions in this area, one treatise remarks that while "[o]rdinarily a party asserting an affirmative defense bears the burden of proof, . . . many courts have been reluctant to require the employer to prove [a] direct [safety] threat.  Their reasoning is that Congress placed burdens on both parties, because the plaintiff must prove that he or she is 'otherwise qualified' for the job.  The plaintiff's showing of being 'otherwise qualified' encompasses or subsumes the issue of direct threat, the argument goes, because a person who is a direct threat would not be qualified for the job; being qualified implies not being a direct threat."  9 L.K. Larson,

terms in c. 151B, but it does not define "capable of performing the essential functions of a particular job."  Section 4 (16), however, recognizes that the safe performance of a job is part of its capable performance, because it requires that a physical or mental job qualification requirement "shall be functionally related to the specific job or jobs for which the individual is being considered and shall be consistent with the safe and lawful performance of the job."  See Dahill, 434 Mass. at 240, quoting Cox, 414 Mass. at 383-384 ("The public policies underlying G. L. c. 151B, § 4 [16], are clear:  to protect 'handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of [employers] as avoiding exposing

---

Employment Discrimination § 156.03[4][c] (2d ed. 2016) (Larson). See Equal Employment Opportunity Comm'n v. Amego, Inc., 110 F.3d 135, 143 (1st Cir. 1997) ("Under § 504 [of the Rehabilitation Act], it is clear that the question of whether the employment of the plaintiff poses risks to the health of others is analyzed as a matter of whether the person is "otherwise qualified").

Those Federal courts that take the opposite view and place the burden of proof on the employer have emphasized that the Americans with Disabilities Act, 42 U.S.C. § 12113(a), (b), provides a defense to a charge of disability discrimination where the individual poses "a 'direct threat' to the health or safety of him or herself or to others in the workplace." Larson, supra, citing Equal Employment Opportunity Comm'n v. Wal-Mart Stores, Inc., 477 F.3d 561, 571 (8th Cir. 2007); Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999); U.S. Equal Employment Opportunity Comm'n v. AIC Sec. Investigations, 55 F.3d 1276, 1283-1284 (7th Cir. 1995). General Laws c. 151B, § 4 (16), does not set forth a "direct threat" defense; it simply places on the employee the burden of proving that he or she is a "qualified handicapped person."

others to significant health and safety risks'"). Section 4 (16) does not recognize a separate affirmative defense of "reasonable probability of substantial harm" to the employee or others. See MCAD Guidelines, supra at IX.B.3.

While the handicapped employee ultimately bears the burden of proving that he or she can safely perform the essential functions of a particular job, the employee need only confront this burden where the employer has met its burden of producing specific evidence showing that the employee would pose an unacceptably significant risk of serious injury to the employee or others.[11] The employer meets its burden of production where it offers evidence showing that it has made "an individualized factual inquiry" based on substantial information regarding the employee's individual work and medical history. See MCAD Guidelines, supra at § IX.B.3. See also Knapp v. Northwestern Univ., 101 F.3d 473, 484-486 (7th Cir. 1996), cert. denied, 520 U.S. 1274 (1997). It may not meet its burden based upon pure speculation as to the likely risk of injury. See MCAD Guidelines, supra. Nor is it sufficient to show simply an increased risk of injury. See id. See also Mantolete v. Bolger, 767 F.2d 1416, 1422 (9th Cir. 1985), quoting S. Rep. No.

---

[11] We choose the standard of an "unacceptably significant risk of serious injury to the employee or others" because we recognize that the performance of some inherently dangerous jobs might always involve a significant risk of serious injury to the employee or others.

48, 93rd Cong., 1st Sess., at 16 (1974) ("A mere 'elevated risk' standard is not sufficient to insure handicapped people's 'right to employment which complements their abilities'").  The employer must offer evidence showing an increased risk of serious injury that is so significant that it cannot reasonably be deemed acceptable by an employer.  See Beal v. Selectmen of Hingham, 419 Mass. 535, 543 (1995) (concluding that plaintiff who was discharged as police officer has no reasonable expectation of demonstrating that she is "qualified handicapped person" under G. L. c. 151B "[b]ecause police officers are responsible for public safety, and the plaintiff's handicap severely compromises her capability to ensure the general safety of the public").  See also Burton v. Metropolitan Transp. Auth., 244 F. Supp. 2d 252, 262 (S.D.N.Y. 2003) (plaintiff not qualified to perform essential functions of his bus driver position where his health condition posed "unacceptable" risk to public).

Where the employer has satisfied this burden of production, the plaintiff employee must prove that he or she is capable of performing the essential functions of the job without posing an unacceptably significant risk of serious injury to the employee or others.  In making this determination, the fact finder must consider the potential severity of the feared injury and the probability that the employee in that position would cause such

injury.  An employee may be found incapable of safely performing the essential functions of a position, and therefore not qualified under the statute, without the risk rising to the standard of a "reasonable probability of substantial harm." Contrast MCAD Guidelines, supra at § IX.B.3, quoting Ryan, 11 M.D.L.R. at 1242.

Conclusion.  We reverse the allowance of the defendant's motion for summary judgment, and remand the case for a trial.

So ordered.